**JS-6**

1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| EAST YARD COMMUNITIES FOR ENVIRONMENTAL JUSTICE, <br><br>            Plaintiff, <br><br> v. <br> PHILLIPS 66 COMPANY d.b.a. LA REFINERY WILMINGTON PL and LOS ANGELES REFINERY, <br><br>            Defendant. | Civ. No. 2:21-CV-01088-FLA (MAA) <br><br> **CONSENT DECREE** |

**CONSENT DECREE**

This Consent Decree is entered into between Phillips 66 Company ("Phillips 66") and East Yard Communities for Environmental Justice ("East Yard") (together, "Parties").  This Court retains jurisdiction to enforce the terms of this Consent Decree.

**BACKGROUND**

A.    WHEREAS, Phillips 66 is a diversified energy manufacturing and logistics company that owns and operates a petroleum refinery in Southern California, referred to as its Los Angeles Refinery; and

B.    WHEREAS, the Phillips 66 Los Angeles Refinery comprises two plants, referred to as its Wilmington Plant and its Carson Plant, respectively; and

C.    WHEREAS, on or about April 29, 2020, East Yard, as required under 42 U.S.C. § 7604(b)(2), provided notice via certified mail to the United States Environmental Protection Agency ("U.S. EPA"), the South Coast Air Quality Management District ("SCAQMD"), and Phillips 66 of its intent to file a citizen suit under the Clean Air Act against Phillips 66 ("Notice of Intent"); and

D.    WHEREAS, East Yard's Notice of Intent alleges Phillips 66's violations of SCAQMD Rule 1173[1] and Rule 1176[2]; and

E.    WHEREAS, East Yard filed a Complaint in the United States District Court, Central District of California, concerning these alleged violations; and

F.    WHEREAS, the Parties have engaged in settlement negotiations, and have reached terms, as set forth herein, upon which to settle their disputes.

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which is acknowledged by all Parties, the Parties herby agree as follows:

---

[1] http://www.aqmd.gov/docs/default-source/rule-book/reg-xi/rule-1173.pdf.
[2] http://www.aqmd.gov/docs/default-source/rule-book/reg-xi/rule-1176.pdf.

## COMPLIANCE AND PERFORMANCE OBLIGATIONS

1. <u>Optical Gas Imaging Technology</u>.  Beginning January 1, 2021, Phillips 66's Leak Detection and Repair ("LDAR") program technicians shall use handheld optical gas imaging ("OGI") technology, in combination with other LDAR tools currently in use, as part of its LDAR program at the Wilmington Plant and the Carson Plant.

    a.    Phillips 66's LDAR program technicians shall use the OGI technology at a frequency of at least once a week during scheduled monitoring or auditing rounds to inspect various units and equipment applicable to Rules 1173 and 1176 including, but not limited to, process units, wastewater treatment units, pumps, compressors, and hatches.

    b.    When the OGI technology reveals a leak, Phillips 66's LDAR program technicians will immediately investigate the suspected unit or equipment for appropriate follow-up in accordance with applicable timelines under SCAQMD Rule 1173 and Rule 1176.

    c.    Phillips 66 shall maintain records documenting (i) the procedures to be used for the OGI survey and (ii) the performance of the weekly survey, including date, time, and inspector.  Any leaks that are identified as a result of the survey shall be managed and documented as required by SCAQMD Rules 1173 and 1176, as applicable.  Phillips 66 shall provide copies of records documenting the performance of the weekly surveys to East Yard with the quarterly reports provided under Paragraph 8 of this Consent Decree for a period of five years beginning July 1, 2021 and ending June 30, 2026.

2. <u>LDAR Audits</u>.  Phillips 66 is required to conduct internal and third-party audits of its LDAR program at the Wilmington Plant and the Carson Plant under the consent decree entered into in *United States of America v. ConocoPhillips Company* (S.D. Tex., No. H-05-0258) ("2005 Consent Decree")

(incorporated by reference into this Consent Decree as Exhibit A).  Phillips 66 shall continue to conduct these internal and third-party audits for an additional 10 years immediately following any possible termination of the audit requirement under the 2005 Consent Decree.

3.     <u>Contents of LDAR Audits</u>. The internal and third-party LDAR audits shall include the items enumerated under Paragraph 227 of the 2005 Consent Decree.  The internal and third-party LDAR audits shall also specifically audit Phillips 66's compliance with all of the provisions of the instant Consent Decree.

4.     <u>Submission of LDAR Audits</u>.  Phillips 66 shall submit the audit reports identified in Paragraph 2 to East Yard contemporaneous with Phillips 66's submission of the reports to the U.S. EPA, but no later than 90 days after Phillips 66's receipt of each final audit report.  The audit reports sent to East Yard shall include an addendum that specifically addresses the audit of Phillips 66's compliance with the provisions of this Consent Decree.  If the 2005 Consent Decree is terminated, Phillips 66 shall provide copies of the internal and third-party audits within 90 days of receipt of each final audit report.

5.     <u>LDAR Monitoring and Reporting under Rule 1173</u>.  Beginning on April 1, 2021, Phillips 66 shall conduct reinspections of repaired or replaced components under Rule 1173 within 30 days after the repair or replacement. Such reinspections are separate and subsequent to the post-leak rate measurements that Phillips 66 must record after a repair or replacement.  Phillips 66 shall include all data regarding these reinspections as part of its quarterly reports submitted to the SCAQMD in accordance with Rule 1173 beginning April 1, 2021.  The quarterly reports shall include the time of each inspection and reinspection.

6.     <u>LDAR Monitoring and Reporting under Rule 1176</u>.  Beginning on April 1, 2021, Phillips 66 shall conduct reinspections of repaired or replaced components between 7 to 30 days after the repair or replacement to confirm that

the repair or replacement remains effective.  Such reinspections are separate and subsequent to the post-leak rate measurements that Phillips 66 must record after a repair or replacement.  Phillips 66 shall include all data regarding these reinspections in its quarterly reports submitted to the SCAQMD in accordance with Rule 1176.  The quarterly reports shall include the name of the inspector conducting each inspection and reinspection where required by SCAQMD Rule 1176.

7.   <u>LDAR Electronic Database Software Updates</u>.  By April 1, 2021, Phillips 66 shall complete any necessary LDAR software upgrades to the electronic database for storing and reporting LDAR data to comply with the LDAR monitoring and reporting requirements under Paragraphs 5 and 6 of this Consent Decree. By May 1, 2021, Phillips 66 shall notify East Yard that it has completed all necessary LDAR software upgrades.

8.   <u>Submission of Rule 1173 and Rule 1176 Inspection Reports</u>.  On a quarterly basis beginning on July 1, 2021, and quarterly thereafter for a period of five (5) years ending April 1, 2026, Phillips 66 shall provide copies to East Yard of all reports submitted to SCAQMD under Rule 1173 and Rule 1176 for that quarter. These copies shall be provided via electronic mail at the e-mail addresses listed under Paragraph 18.

9.   <u>Quality Assurance and Quality Control</u>.  Beginning on January 1, 2021, Phillips 66 shall conduct a two-step, two-touch Quality Assurance and Quality Control process for its compliance with the recording and reporting requirements of Rule 1173 and Rule 1176.  In the first step of this process, Phillips 66's LDAR Coordinator for the Los Angeles Refinery shall review all records required under Rule 1173 and Rule 1176 prior to submission to the SCAQMD.  In the second step of this process, Phillips 66's Environmental Manager (or equivalent position) shall perform a second review of the reports prior to submission for accuracy and completeness.  The records will include the

name of the LDAR Coordinator and the name and signature of the Environmental Manager performing the review.

      10.  <u>Emission Reduction Projects</u>.

        a.    By July 1, 2021, Phillips 66 shall pave an approximately 200-foot by 150-foot (30,000 square feet) gravel and dirt parking lot adjacent to the Wilmington Plant west fenceline.  Phillips 66 shall notify East Yard that it has completed this project within 14 days of project completion and provide photographs of the lot both before and after paving.

        b.    Beginning on January 1, 2021, Phillips 66 shall replace a minimum of 125 non-bellows sealed valves currently in service at the Wilmington Plant and/or the Carson Plant by December 31, 2022, and a minimum of 150 valves in total by December 31, 2023.  Phillips 66 shall replace these non-bellows sealed valves with bellows sealed leakless valves approved as Best Available Control Technology by SCAQMD.  Phillips 66 shall submit to East Yard an annual written report by February 1, 2022, February 1, 2023, and February 1, 2024, that details Phillips 66's replacement of non-bellows sealed valves at the Wilmington Plant and the Carson Plant during the previous calendar year. These valve replacements shall be in addition to and separate from any valve replacements required under any other agreement or permit condition due to valve defect, warranty expiration, routine maintenance, or other operational issues.

        c.    Within 30 days of Court approval of this Consent Decree pursuant to Paragraph 12 below, Phillips 66 shall pay the amount of $20,000 (Twenty Thousand Dollars) to TreePeople, a 501(c)(3) non-profit organization, to fund a tree planting program for communities within zip codes 90810, 90744, and 90745 near the Wilmington Plant and the Carson Plant. TreePeople may use up to 10 percent of this amount for administrative costs related to this tree planting program.

CONSENT DECREE

11.   <u>Attorneys' Fees and Expert Costs</u>.  Within 30 days of Court approval of this Consent Decree pursuant to Paragraph 12 below, Phillips 66 shall pay the sum of $24,422.13 (Twenty Four Thousand Four Hundred Twenty Two Dollars and Thirteen Cents) to Earthjustice.  Payment shall be made by wire transfer to Earthjustice's California Attorney Trust Account.  Payment of this amount shall resolve any and all claims by East Yard against Phillips 66 for attorneys' fees and costs related to the Notice of Intent.

## **GENERAL PROVISIONS**

12.   Within 10 days of the execution of this Consent Decree, East Yard shall file this Consent Decree with the Court and serve a copy on the Attorney General and the U.S. EPA Administrator, along with a motion or stipulation asking the Court to enter this Consent Decree as a resolution of all claims identified in the Complaint after the expiration of the 45-day notice period in Section 304(c)(3) of the Clean Air Act.  Except as stated in individual paragraphs, implementation of the provisions of this Consent Decree shall not be delayed pending the Court's approval.  Should the court fail to approve this settlement, the provisions of this Consent Decree shall be null and void.

13.   Upon (1) the Court's approval of this Consent Decree, (2) Phillips 66's implementation of the programmatic changes required under Paragraphs 1 through 9 above, and (3) Phillips 66's completion of the actions required under Paragraphs 10 through 11 above, the Parties fully and forever release each other, as well as their respective parents, affiliates, subsidiaries, and successors-in-interest, including any of their elected and appointed officers, directors, agents, servants, employees, or representatives, from any and all liabilities, causes of action, damages, fines, costs, attorneys' fees, civil penalties, claims and demands of any kind or any nature whatsoever, in law or in equity, arising out of, or connected, directly or indirectly, to East Yard's Notice of Intent in existence as of the execution of this Consent Decree. Notwithstanding any foregoing provisions

to the contrary, East Yard reserves its rights to enforce Phillips 66's obligations under this Consent Decree and any claims in existence after the execution of this Consent Decree.

14.   In entering this Consent Decree, Phillips 66 expressly denies any and all liability associated with any claims by East Yard as outlined in East Yard's Notice of Intent.  This Consent Decree is not an admission of the validity or invalidity of any claims, causes of action, lawsuits, liabilities, penalties, fines, or obligations of any nature whatsoever released pursuant to this Consent Decree.

15.   This Consent Decree shall be binding on and inure to the benefit of, and be enforceable by, the Parties and their respective successors, assigns, and legal representatives.  In the event Phillips 66 proposes to sell or transfer, in whole or in part, its legal or equitable interest in the Wilmington Plant and/or the Carson Plant, Phillips 66 shall notify East Yard of such proposed sale, transfer, or assignment, shall advise the proposed purchaser, successor-in-interest, assignee, or transferee of the existence of this Consent Decree, and shall condition the sale, transfer, or assignment on the purchaser's, successor-in-interest's, assignee's or transferee's agreement to comply with the terms hereof.

16.   The Parties represent and warrant that the Parties own the rights released herein and have not assigned or transferred or purported to transfer any such rights to any other person or entity.  No other persons shall have any rights under this Consent Decree.

17.   This Consent Decree, including any attached exhibits and documents referred to and incorporated herein, constitutes the entire Consent Decree between the Parties with respect to the subject matter hereof and supersedes all previous negotiations, proposals, commitments, writings, advertisements, publications, and understandings of any nature whatsoever unless expressly included in this Consent Decree.

18.   All notices, requests, demands and other communications that are required or may be given under this Consent Decree shall be in writing and shall be deemed to have been duly given when received if personally delivered; the day after sent, if sent for next day delivery to a domestic address by recognized overnight delivery service (e.g., UPS or Federal Express); upon receipt, if sent by certified or registered mail, return receipt requested; and upon confirmed delivery receipt if sent by electronic mail during the recipient's normal business hours (9:00 a.m. through 5:00 p.m. prevailing time, Monday through Friday).  In each case notice shall be sent to the addresses set forth below, or at such other place and with such other copies as any Party may designate as to itself by written notice to the others.

| | |
|---|---|
| **Phillips 66:** | Phillips 66 Company<br>Attn: Refinery Manager<br>Los Angeles Refinery<br>1660 West Anaheim Street<br>Wilmington, CA 90744<br>Phone: (310) 952-6001 |
| **East Yard:** | East Yard Communities for Environmental Justice<br>Attn: Jan Victor Andasan & Whitney Amaya<br>2317 S. Atlantic Boulevard<br>Commerce, CA 90040<br>Phone: (323) 263-2113<br>eastyardadmin@gmail.com<br>janvictor.eycej@gmail.com<br>amayaw.eycej@gmail.com |

CONSENT DECREE

19.   This Consent Decree shall be construed, interpreted, and the rights of the Parties determined in accordance with the laws of the State of California without regard to the conflicts of law or choice of law provisions thereof.

20.   This Consent Decree may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

21.   This Consent Decree may not be modified except by a writing signed by each of the Parties that shall be promptly filed with the Court.

22.   Each Party hereto represents and warrants that it has the full power and authority to enter into this Consent Decree and to obligate the Party or Parties on whose behalf it is signing and that no further action or authorization is necessary to execute this Consent Decree on behalf of such Party.

23.   In the event that any one or more of the provisions contained in this Consent Decree or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality, or unenforceability shall not affect any other provision of this Consent Decree or any other such instrument.

24.   Prior to initiating a proceeding for breach of this Consent Decree, notice shall first be given in accordance with Paragraph 18 to provide the breaching Party with an opportunity to cure of 30 days.  The Parties agree and stipulate that, upon expiration of the 30-day cure period, either Party may file a motion to enforce the terms of this Consent Decree.  No Party shall be subject to any claim for damages as a result of a breach of this Consent Decree.  The Parties agree that the Court shall maintain jurisdiction over this matter to enforce the terms of the Consent Decree. The venue for any dispute arising from or related to this Consent Decree, its performance, and its interpretation shall be the United States District Court, Central District of California.

25.   Each Party hereto represents and agrees with each other Party that it has been represented by or had the opportunity to be represented by, independent counsel of its own choosing, and that it has had the full right and opportunity to consult with its respective attorney(s), that to the extent, if any, that it desired, it availed itself of this right and opportunity, that it has carefully read and fully understood this Consent Decree in its entirety and has had it fully explained to them by such Party's respective counsel, that each is fully aware of the contents thereof and its meaning, intent, and legal effect, and that it is competent to execute this Consent Decree and has executed this Consent Decree free from coercion, duress, or undue influence.  The Parties agree that each Party has reviewed and revised this Consent Decree and that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not apply in the interpretation of this Consent Decree or any amendment hereto or thereto or exhibits herein or therein.

## ENTRY BY THE COURT

This Consent Decree is approved and hereby entered as an Order of this Court this _ 12th _ of _ April _, 2021.

Fernando L. Aenlle-Rocha
United States District Judge

1

## SIGNATURES OF AUTHORIZED REPRESENTATIVES OF THE

2

## PARTIES

3

4   FOR EAST YARD COMMUNITIES FOR ENVIRONMENTAL JUSTICE:

5

6   _____   Date:   02 / 09 / 2021

7   Taylor Thomas, Co-Director

8

9

10

11   FOR PHILLIPS 66 COMPANY:

12

13   _____   Date:   2/2/2021

14   Tim Seidel
     Manager, Los Angeles Refinery

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12

[PROPOSED] CONSENT DECREE

# EXHIBIT A
## TO THE CONSENT DECREE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

United States Courts
Southern District of Texas
FILED

JAN 2 7 2005

Michael N. Milby, Clerk of Court

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF ILLINOIS,<br>STATE OF LOUISIANA,<br>STATE OF NEW JERSEY,<br>COMMONWEALTH OF PENNSYLVANIA,<br>NORTHWEST CLEAN AIR AGENCY,<br><br>          Plaintiffs,<br><br>     v.<br><br>CONOCOPHILLIPS COMPANY,<br><br>          Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **H - 05 - 0258**<br><br>CIVIL ACTION NO. _____<br><br>JUDGE |

## CONSENT DECREE

## TABLE OF CONTENTS

I.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.    APPLICABILITY AND BINDING EFFECT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.   OBJECTIVES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV.    DEFINITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V.     AFFIRMATIVE RELIEF/ENVIRONMENTAL PROJECTS . . . . . . . . . . . . . . . . . . . . . 28

       A.    NO$_x$ Emissions Reductions from FCCUs . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       B.    SO$_2$ Emissions Reductions from FCCUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

       C.    PM Emissions Reductions from FCCUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

       D.    CO Emissions Reductions from FCCUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

       E.    NSPS Applicability of FCCU Catalyst Regenerators . . . . . . . . . . . . . . . . . . . 71

       F.    NO$_x$ Emissions Reductions from Combustion Units . . . . . . . . . . . . . . . . . . . 73

       G.    SO$_2$ Emissions Reductions from and NSPS Applicability to Heaters
             and Boilers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

       H.    NSPS Applicability of Sulfur Recovery Plants . . . . . . . . . . . . . . . . . . . . . . . 86

       I.    NSPS Applicability of the Sulfuric Acid Plant at LAR Wilmington . . . . . . . . 98

       J.    NSPS Applicability of Flaring Devices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

       K.    CERCLA/EPCRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

       L.    Control of Acid Gas Flaring Incidents and Tail Gas Incidents. . . . . . . . . . . . 103

       M.    Control of Hydrocarbon Flaring Incidents . . . . . . . . . . . . . . . . . . . . . . . . . . 112

       N.    Benzene Waste Operations NESHAP Program Enhancements . . . . . . . . . . . 114

ii

O.  Leak Detection and Repair Program Enhancements . . . . . . . . . . . . . . . . . . . . . . 133

P.  Incorporation of Consent Decree Requirements into Federally Enforceable Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

VI.  EMISSION CREDIT GENERATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

VII.  MODIFICATION TO IMPLEMENTATION SCHEDULES . . . . . . . . . . . . . . . . . . . . 149

VIII.  SUPPLEMENTAL/BENEFICIAL ENVIRONMENTAL PROJECTS . . . . . . . . . . . 153

IX.  REPORTING AND RECORDKEEPING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

X.  CIVIL PENALTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

XI.  STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

A.  Non-Compliance with Requirements for $NO_x$ Emissions Reductions from FCCUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

B.  Non-Compliance with Requirements for $SO_2$ Emissions Reductions from FCCUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

C.  Non-Compliance with Requirements for PM Emissions Reductions from FCCUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

D.  Non-Compliance with Requirements for CO Emissions Reductions from FCCUs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

E.  Non-Compliance with Requirements for NSPS applicability of FCCU Catalyst Regenerators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

F.  Non-Compliance with $NO_x$ Emissions Reductions from Combustion Units . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

G.  Non-Compliance with $SO_2$ Emissions Reductions from Heaters and Boilers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

H.  Non-Compliance with Requirements for NSPS Applicability of Sulfur Recovery Plants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

iii

I.      Non-Compliance with Requirements for NSPS Applicability of the
        Sulfuric Acid Plant at LAR Wilmington.................................177

J.      Non-Compliance with Requirements for NSPS Applicability of
        Flaring Devices ........................................................177

K.      CERCLA/EPCRA ........................................................178

L.      Non-Compliance with Requirements for Control of Acid Gas Flaring
        Incidents and Tail Gas Incidents ....................................178

M.      Non-Compliance with Requirements for Control of Hydrocarbon Flaring
        Incidents ..............................................................181

N.      Non-Compliance with Requirements for Benzene Waste Operations
        NESHAP Program Enhancements .......................................181

O.      Non-Compliance with Requirements for Leak Detection and Repair
        Program Enhancements ................................................184

P.      Non-Compliance with Requirements Related Incorporating Consent
        Decree Requirements into Federally Enforceable Permits ...............186

Q.      Non-Compliance with Requirements Related to Supplemental/Beneficial
        Environmental Projects ...............................................186

R.      Non-Compliance with Requirements for Reporting and Recordkeeping .....187

S.      Non-Compliance with Requirements for Payment of Civil Penalties ........187

T.      General Provisions Related to Stipulated Penalties .....................188

XII.    INTEREST ................................................................190

XIII.   RIGHT OF ENTRY .........................................................190

XIV.    FORCE MAJEURE ..........................................................191

XV.     RETENTION OF JURISDICTION/DISPUTE RESOLUTION ................193

XVI.    EFFECT OF SETTLEMENT ................................................196

iv

XVII.  GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

XVIII. TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

XIX.   SIGNATORIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 227

## **TABLE OF APPENDICES**

A  List of Flaring Devices at the Covered Refineries

B  List of Combustion Units

C  List of Assets ConocoPhillips Purchased from the Premcor Refining Group in
Hartford, Illinois

D  Determining the Optimized Addition Rates of Catalyst Additives at the FCCUs

E  Predictive Emissions Monitoring Systems for Heaters and Boilers with Capacities
Between 150 and 100 mmBTU/hr

F  FCCU NO$_x$ Control Technology Design and Operating Parameters

G  Study of Breakthrough in Dual Carbon Canisters

H  Table of Violations Asserted by the Louisiana Department of Environmental
Quality

vi

## CONSENT DECREE

WHEREAS, Plaintiff the United States of America ("United States"), by the authority of

the Attorney General of the United States and through its undersigned counsel, acting at the

request and on behalf of the United States Environmental Protection Agency ("EPA"),

Co-Plaintiff the State of Illinois ("Illinois"), on behalf of the Illinois Environmental Protection

Agency ("IEPA"), Co-Plaintiff the State of Louisiana ("Louisiana"), on behalf of the Louisiana

Department of Environmental Quality ("LDEQ"), Co-Plaintiff the State of New Jersey ("New

Jersey"), at the request and on behalf of the New Jersey Department of Environmental Protection

("NJDEP"), Co-Plaintiff the Commonwealth of Pennsylvania ("Pennsylvania") on behalf of the

Pennsylvania Department of Environmental Protection ("PaDEP"), and Co-Plaintiff the

Northwest Clean Air Agency ("NWCAA") have simultaneously filed a Complaint and lodged

this Consent Decree against defendant ConocoPhillips Company ("COPC") for alleged

environmental violations at COPC's petroleum refineries in the following locations: Belle

Chasse, Louisiana ("Alliance Refinery"); City of Linden, New Jersey ("Bayway Refinery");

Borger, Texas ("Borger Refinery"); Carson, California ("LAR Carson"); Ferndale, Washington

("Ferndale Refinery"); Rodeo, California ("Rodeo Refinery"); Santa Maria, California ("Santa

Maria Refinery"); Sweeny, Texas ("Sweeny Refinery"); Trainer, Pennsylvania ("Trainer

Refinery"); Wilmington, California ("LAR Wilmington"); and Roxanna and Hartford, Illinois

("Wood River Refinery" and "Distilling West") (collectively "Covered Refineries");

WHEREAS, COPC also owns and operates three additional refineries which are covered

by a Consent Decree entered in Civil Action Number H-01-4430 in the United States District

Court for the Southern District of Texas and are not included in the "Covered Refineries" under

this Consent Decree;

WHEREAS, the United States alleges, upon information and belief, that COPC has violated and/or continues to violate the following statutory and regulatory provisions:

1) Prevention of Significant Deterioration ("PSD") requirements found at Part C of Subchapter I of the Clean Air Act (the "Act"), 42 U.S.C. §§ 7475, and the regulations promulgated thereunder at 40 C.F.R. § 52.21 (the "PSD Rules"); and "Plan Requirements for Non-Attainment Areas" at Part D of Subchapter I of the Act, 42 U.S.C. §§ 7502-7503, and the regulations promulgated thereunder at 40 C.F.R. § 51.165(a) and (b) and at Title 40, Part 51, Appendix S, and at 40 C.F.R. § 52.24 ("PSD/NSR Regulations"), for heaters and boilers and fluid catalytic cracking unit catalyst regenerators for nitrogen oxide ("$NO_x$"), sulfur dioxide ("$SO_2$"), carbon monoxide ("CO"), and particulate matter ("PM");

2) New Source Performance Standards ("NSPS") found at 40 C.F.R. Part 60, Subparts A and J, under Section 111 of the Act, 42 U.S.C. § 7411 ("Refinery NSPS Regulations"), for sulfur recovery plants, fuel gas combustion devices, and fluid catalytic cracking unit catalyst regenerators;

3) Leak Detection and Repair ("LDAR") requirements promulgated pursuant to Sections 111 and 112 of the Act, and found at 40 C.F.R. Part 60 Subparts VV and GGG; 40 C.F.R. Part 61, Subparts J and V; and 40 C.F.R. Part 63, Subparts F, H, and CC ("LDAR Regulations"); and

4) National Emission Standards for Hazardous Air Pollutants ("NESHAP") for Benzene Waste Operations promulgated pursuant to Section 112(e) of the Act, and found at 40 C.F.R. Part 61, Subpart FF ("Benzene Waste Operations NESHAP Regulations"); and

5) New Source Performance Standards found at 40 C.F.R. Part 60, Subpart H, under

Section 111 of the Act, 42 U.S.C. § 7411 ("Sulfuric Acid Plant NSPS Regulations"), for sulfuric

acid plants;

WHEREAS, the United States also specifically alleges with respect to the Covered

Refineries that, upon information and belief, COPC has been and/or continues to be in violation

of the state implementation plans ("SIPs") and other state and local rules and regulations adopted

by the states and/or local air quality districts in which the Covered Refineries are located to the

extent that such plans, rules, or regulations implement, adopt or incorporate the above-described

federal requirements;

WHEREAS, the United States further alleges that COPC has violated and/or continues to

violate the reporting requirements found at Section 103(a) of the Comprehensive Environmental

Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9603(a), and Section

304(b) and (c) of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42

U.S.C. § 11004(b) and (c), and the regulations promulgated thereunder;

WHEREAS, Illinois, Louisiana, New Jersey, Pennsylvania, and NWCAA have joined in

this matter alleging violations of their respective applicable SIP provisions and/or other state

and/or local rules and regulations incorporating and implementing the foregoing federal

requirements;

WHEREAS, on January 5, 2001, the Ferndale Refinery requested approval of an

alternative means of emission limitation pursuant to 40 C.F.R. § 61.353 for its roughing filter

system claiming it to be equivalent to an enhanced biodegradation unit under 40 C.F.R.

§ 61.348(b)(2)(ii)(B), but for which performance testing completed in February 2004 indicated

that the system could not achieve a level of performance equivalent to an enhanced

3

biodegradation unit under 40 C.F.R. § 61.348(b)(2)(ii)(B), and therefore on April 12, 2004, COPC agreed to no longer pursue the approval of an alternate means of emission limitation but instead to install air pollution control equipment to comply with Benzene Waste Operations NESHAP ("BWON") regulations;

WHEREAS, COPC has not been able to demonstrate compliance with the PM and PM-10 emission limits for the fluidized catalytic cracking unit ("FCCU") at the Ferndale Refinery established by NWCAA in Order of Approval to Construct #733a ("Order of Approval"), Conditions D-4, D-1(b), and E-10(f) including those limitations which were intended to restrict emissions from the Ferndale FCCU project to below the significance levels for PM and PM-10 and thereby avoid the requirements of the PSD program for PM and PM-10;

WHEREAS, COPC has agreed to apply for a PSD permit amendment to include PM and PM-10 for the Ferndale FCCU in the PSD permit and to request a revision of NWCAA's Order of Approval containing conditions limiting PM and PM-10 from the FCCU once the Washington Department of Ecology issues an amended PSD permit which includes PM and/or PM-10;

WHEREAS, the State of New Jersey is in the process of reviewing a permit application for the FCCU at the Bayway Refinery which may result in emission limits more stringent than those in Paragraphs 77 and 84 and nothing in this Consent Decree precludes New Jersey from issuing such a permit nor precludes COPC from contesting such a permit;

WHEREAS, except as otherwise provided in Section V.H., COPC and New Jersey are and continue to be bound by a March 31, 1993 Administrative Consent Order (ACO) A930366, and this Consent Decree, except as otherwise provided in Section V.H. does not preclude or otherwise affect modification, termination, or enforcement of the ACO;

4

WHEREAS, upon Entry of this Decree, COPC will submit an enhancement to the
Reasonably Achievable Control Technology ("RACT") Plan that it already has submitted to the
NJDEP for Volatile Organic Compounds for the Bayway Refinery based upon actions that COPC
will implement under this Consent Decree, and NJDEP will approve the enhanced RACT Plan;

WHEREAS, COPC denies that it has violated the foregoing statutory, regulatory, and SIP
provisions and the state and/or local rules and regulations incorporating and implementing the
foregoing federal requirements, and maintains that it has been and remains in compliance with all
applicable statutes, regulations and permits and is not liable for civil penalties and injunctive
relief;

WHEREAS, with respect to the provisions of Section V.L ("Control of Acid Gas Flaring
Incidents and Tail Gas Incidents") of this Consent Decree, EPA maintains that "[i]t is the intent
of the proposed standard [40 C.F.R. § 60.104] that hydrogen-sulfide-rich gases exiting the amine
regenerator [or sour water stripper gases] be directed to an appropriate recovery facility, such as a
Claus sulfur plant," see Information for Proposed New Source Performance Standards: Asphalt
Concrete Plants, Petroleum Refineries, Storage Vessels, Secondary Lead Smelters and
Refineries, Brass or Bronze Ingot Production Plants, Iron and Steel Plants, Sewage Treatment
Plants, Vol. 1, Main Text at 28;

WHEREAS, EPA further maintains that the failure to direct hydrogen-sulfide-rich gases
to an appropriate recovery facility -- and instead to flare such gases under circumstances that are
not sudden or infrequent or that are reasonably preventable -- circumvents the purposes and
intentions of the standards at 40 C.F.R. Part 60, Subpart J;

WHEREAS, EPA recognizes that "Malfunctions," as defined in Section IV of this
Consent Decree and 40 C.F.R. § 60.2, of the "Sulfur Recovery Plants" or of "Upstream Process

5

Units" may result in flaring of "Acid Gas" or "Sour Water Stripper Gas" on occasion, as those terms are defined herein, and that such flaring does not violate 40 C.F.R. § 60.11(d) if the owner or operator, to the extent practicable, maintains and operates such units in a manner consistent with good air pollution control practice for minimizing emissions during these periods;

WHEREAS, based upon information available to COPC, COPC has provided an evaluation of the causes and corrective actions for the flaring incidents that occurred at the Covered Refineries for the five years prior to September 30, 2004, and that evaluation is contained in a document dated September 30, 2004;

WHEREAS, within forty-five (45) days after the Entry of this Consent Decree: (i) the United States, the State of Illinois, and COPC agree to jointly move to terminate the consent decree entered in the case of United States, et al. v. Shell Oil Co., et al., Civil Action No. 98-652-GPM (S.D. Ill. 1998); (ii) the United States and COPC agree to jointly move to terminate the consent decree entered in the case of United States v. Shell Oil Co., et al., Civil Action No. 97-539-WDS (S.D. Ill 1997); and within thirty (30) days of Lodging: (i) EPA agrees that COPC no longer will be subject to the reporting requirements of Appendix C of EPA's Clean Air Act Section 114(a) Request for Information dated December 12, 1994, regarding the Wood River Refinery;

WHEREAS, COPC has represented that it or a predecessor company assumed ownership and operation of the Covered Refineries on the following dates:

| | |
|---|---|
| Alliance | September 8, 2000 |
| Bayway | April 8, 1993 |
| Borger | Prior to 1970 |
| Ferndale | December 27, 1993 |
| LAR Carson | April 1, 1997 |
| LAR Wilmington | April 1, 1997 |
| Rodeo | April 1, 1997 |

6

| Santa Maria | April 1, 1997 |
|---|---|
| Sweeny | Prior to 1970 |
| Trainer | February 2, 1996 |
| Wood River, excluding Distilling West | June 1, 2000 |
| Distilling West | July 31, 2003 |

WHEREAS, projects undertaken pursuant to this Consent Decree are for the purposes of abating or controlling atmospheric pollution or contamination by removing, reducing, or preventing the creation of emission of pollutants ("pollution control facilities") and as such, may be considered for certification as pollution control facilities by federal, state, or local authorities;

WHEREAS, EPA recently issued PSD Rules and PSD/NSR Regulations, see 67 Fed. Reg. 80186-80289 (2002), that identify and address "Pollution Control Projects" and "Clean Units" and the applicability of PSD/NSR permitting requirements to such Projects or Units;

WHEREAS, EPA previously issued guidance ("Pollution Control Projects and New Source Review (NSR) Applicability," July 1, 1994) identifying and addressing "Pollution Control Projects" and the applicability of PSD/NSR permitting requirements to such Projects;

WHEREAS, EPA agrees that under the recently issued PSD Rules and PSD/NSR Regulations that identify and address "Clean Units", see 67 Fed. Reg. 80186 et seq., units that accept the following emission limits under this Consent Decree may be considered as "Clean Units" with respect to the identified pollutants:

For FCCUs
- 20 ppmvd $NO_x$ at 0% $O_2$ on a 365-day rolling average basis
- 25 ppmvd $SO_2$ at 0% $O_2$ on a 365-day rolling average basis
- 100 ppmvd CO at 0% $O_2$ on a 365-day rolling average basis
- 0.5 pounds of PM per 1,000 pounds of coke burned on a 3-hour average basis

For Heaters and Boilers -- 0.020 lbs/mmBTU $NO_x$

7

Units with higher limits may be considered as "Clean Units" under applicable rules at the discretion of the permitting agency (for example, FCCUs controlled by LoTOx Systems where EPA has established $NO_x$ limits pursuant to this Consent Decree). EPA also agrees that pursuant to applicable rules, state and local permitting agencies reserve the right to establish more stringent requirements, including emission limits, than those set forth above in this Paragraph for "Clean Units";

WHEREAS, EPA agrees that under recently issued PSD Rules and PSD/NSR Regulations that identify and address "Pollution Control Projects", see 67 Fed. Reg. 80186 et seq., and under prior EPA guidance ("Pollution Control Projects and New Source Review (NSR) Applicability," July 1, 1994), the following activities may be considered as "Pollution Control Projects" under such rules, regulations, and guidance, provided that COPC complies with the requirements for "Pollution Control Projects" under applicable federal, state, and local regulations and policies.

For FCCUs: Activities required to comply with Sections V.A and V.B of this Consent Decree (reduction of $NO_x$ and $SO_2$ emissions by the use of hardware and/or the use of catalyst additives under the applicable protocol).

For Heaters and Boilers: Activities undertaken to comply with Paragraph 95 of this Consent Decree (reduction of $NO_x$ emissions by 4951 tons through the installation of Qualifying Controls (as defined in Paragraph 94)).

EPA also agrees that pursuant to applicable rules, state and local permitting agencies reserve the right to establish more stringent requirements.

WHEREAS, EPA expects that COPC will design, operate and maintain the controls identified in the preceding Paragraph in a manner consistent with standard and reasonable air

pollution control practices, and that collateral emissions increases will be adequately addressed by COPC;

WHEREAS, the United States is engaged in a federal strategy for achieving cooperative agreements with petroleum refineries in the United States to achieve across-the-board reductions in emissions ("Global Settlement Strategy");

WHEREAS, COPC consents to the simultaneous filing of the Complaint and lodging of this Consent Decree against COPC (despite its denial of the allegations in the Complaint) in order to accomplish its objective of cooperatively reconciling the goals of the United States, the Co-Plaintiffs, and COPC under the Clean Air Act and the corollary state statutes and regulations, and therefore agrees to undertake the installation of air pollution control equipment and enhancements to its air pollution management practices at the Covered Refineries to reduce air emissions by participating in the Global Settlement Strategy;

WHEREAS, by entering into this Consent Decree, COPC has indicated that it is committed to pro-actively resolving environmental concerns relating to its operations;

WHEREAS, the United States anticipates that the affirmative relief and environmental projects identified in Sections V and VIII of this Consent Decree will reduce emissions of nitrogen oxide by approximately 10,000 tons annually, will reduce emissions of sulfur dioxide by approximately 37,200 tons annually, and will also result in reductions of volatile organic compounds and particulate matter ("PM");

WHEREAS, discussions between the Parties have resulted in the settlement embodied in the Consent Decree;

WHEREAS, COPC has waived any applicable federal or state requirements of statutory notice of the alleged violations;

WHEREAS, notwithstanding the foregoing reservations, the Parties agree that: (a) settlement of the matters set forth in the Complaint (filed herewith) is in the best interests of the Parties and the public; and (b) entry of the Consent Decree without litigation is the most appropriate means of resolving this matter;

WHEREAS, the Parties recognize, and the Court by entering the Consent Decree finds, that the Consent Decree has been negotiated at arms length and in good faith and that the Consent Decree is fair, reasonable, and in the public interest;

NOW THEREFORE, with respect to the matters set forth in the Complaint, and in Section XVI of the Consent Decree ("Effect of Settlement"), and before the taking of any testimony, without adjudication of any issue of fact or law, and upon the consent and agreement of the Parties to the Consent Decree, it is hereby ORDERED, ADJUDGED and DECREED as follows:

## I. JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action and over the Parties pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367(a). In addition, this Court has jurisdiction over the subject matter of this action pursuant to Sections 113(b) and 167 of the CAA, 42 U.S.C. §§ 7413(b) and 7477, Section 325(b) of EPCRA, 42 U.S.C. § 11045(b), and Section 109(c) of CERCLA, 42 U.S.C. § 9609(c). The Complaint states a claim upon which relief may be granted for injunctive relief and civil penalties against COPC under the Clean Air Act, EPCRA, and CERCLA. The authority of the United States to bring this suit is vested in the United States Department of Justice by 28 U.S.C. §§ 516 and 519 and Section 305 of the CAA, 42 U.S.C. § 7605, Section 325 of EPCRA, 42 U.S.C. § 11045, and Section 109(c) of CERCLA, 42 U.S.C. § 9606(c).

2.    Venue is proper in the United States District Court for the Southern District of Texas pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c), and 1395(a).  COPC consents to the personal jurisdiction of this Court and waives any objections to venue in this District.

3.    Notice of the commencement of this action has been given to the State of New Jersey, the Commonwealth of Pennsylvania, the State of Illinois, the State of Louisiana, the State of Texas, the California Air Resources Board, the South Coast Air Quality Management District, the San Luis Obispo County Air Pollution Control District, the Bay Area Air Quality Management District, the State of Washington, and the Northwest Clean Air Agency in the State of Washington, in accordance with Section 113(a)(1) of the Clean Air Act, 42 U.S.C. § 7413(a)(1), and as required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

## II.  APPLICABILITY AND BINDING EFFECT

4.    The provisions of the Consent Decree will apply to the Covered Refineries.  The provisions of the Consent Decree will be binding upon the United States, the Co-Plaintiffs, and COPC, including COPC's officers, agents, servants, employees in their capacity as such, and all other persons and entities as provided for by Fed. R. Civ. P. 65(d).

5.    COPC agrees not to contest the validity of the Consent Decree in any subsequent proceeding to implement or enforce its terms.

6.    Effective from the Date of Entry of the Consent Decree until its termination, COPC agrees that the Covered Refineries are covered by this Consent Decree.  To the extent that, pursuant to the requirements of Section XVIII, this Consent Decree terminates with respect to a particular Covered Refinery prior to the termination of the entire Consent Decree, this Paragraph applies to such Refinery until the Consent Decree terminates as to that particular Refinery.

11

Effective from the Date of Lodging of the Consent Decree, COPC will give written notice of the

Consent Decree to any successors in interest prior to the transfer of ownership or operation of

any portion of any Covered Refinery and will provide a copy of the Consent Decree to any

successor in interest.  COPC will notify the United States and the Applicable Co-Plaintiff in

accordance with the notice provisions set forth in Paragraph 433 (Notice), of any successor in

interest at least thirty (30) days prior to any such transfer.

7.   Pursuant to Section 2-1304 of the Illinois Code of Civil Procedure, 735 ILCS

5/2-1304, the injunctive provisions of this Consent Decree applicable to the Wood River

Refinery, including the Distilling West assets, will be a lien upon the real and personal estate, or

both, of COPC within the Wood River Refinery, including Distilling West, until such provisions

are fully complied with and such lien will have the same force and effect, and be subject to the

same limitations and restrictions, as judgments for the payment of money.

8.   COPC will condition any transfer, in whole or in part, of ownership of, operation

of, or other interest (exclusive of any non-controlling non-operational shareholder interest) in,

any Covered Refinery upon the execution by the transferee of a modification to the Consent

Decree which makes the terms and conditions of the Consent Decree that apply to such Covered

Refinery applicable to the transferee.  As soon as possible prior to the transfer, COPC will notify

the United States and the Applicable Co-Plaintiff of the proposed transfer and of the specific

Consent Decree provisions that the transferee is assuming.  Simultaneously, COPC will provide a

certification from the transferee that the transferee has the financial and technical ability to

assume the obligations and liabilities under this Consent Decree that are related to the transfer.

By no later than sixty (60) days after the transferee executes a document agreeing to substitute

itself for COPC for all terms and conditions of this Consent Decree that apply to the Covered

12

Refinery that is being transferred, the United States, the Applicable Co-Plaintiff, COPC, and the transferee will jointly file with the Court a motion requesting the Court to substitute the transferee as the Defendant for those terms and conditions of this Consent Decree that apply to the Covered Refinery that is being transferred. If COPC does not secure the agreement of the United States and the Applicable Co-Plaintiff to a Joint Motion within sixty (60) days, then COPC and the transferee may file a motion without the agreement of the United States and the Applicable Co-Plaintiff. The United States and the Applicable Co-Plaintiff thereafter may file an opposition to the motion. COPC will not be released from the obligations and liabilities of any provision of this Consent Decree unless and until the Court grants the motion substituting the transferee as the Defendant to those provisions.

9.      Except as provided in Paragraph 8, COPC will be solely responsible for ensuring that performance of the work required under this Consent Decree is undertaken in accordance with the deadlines and requirements contained in this Consent Decree and any attachments hereto. COPC will provide a copy of the applicable provisions of this Consent Decree to each consulting or contracting firm that is retained to perform work required under Sections V.N. and V.O of this Consent Decree, upon execution of any contract relating to such work. No later than thirty (30) days after the Date of Lodging of the Consent Decree, COPC also will provide a copy of the applicable provisions of this Consent Decree to each consulting or contracting firm that COPC already has retained to perform the work required under Sections V.N and V.O of this Consent Decree. Copies of the Consent Decree do not need to be supplied to firms who are retained to supply materials or equipment to satisfy requirements under this Consent Decree.

### III. OBJECTIVES

10.    It is the purpose of the Parties in this Consent Decree to further the objectives of

the federal Clean Air Act and the rules and regulations promulgated thereunder, the Illinois

Environmental Protection Act, 415 ILCS 5/1 – 58.17, the Louisiana Environmental Quality Act,

LSA-R.S. 30:2001 et seq., New Jersey's Air Pollution Control Act, N.J.S.A. 26:2C-1 et seq.,

("New Jersey Air Act") and the regulations adopted thereunder by NJDEP pursuant thereto at

N.J.S.A. 7:27-1 et seq., the Pennsylvania Air Pollution Control Act, 35 P.S. § 4001 et seq., and

the Washington Clean Air Act, Chapter 70.94 RCW.

### IV. DEFINITIONS

11.    Unless otherwise defined herein, terms used in the Consent Decree will have the

meaning given to those terms in the Clean Air Act and the implementing regulations

promulgated thereunder.  The following terms used in the Consent Decree will be defined for

purposes of the Consent Decree and the reports and documents submitted pursuant thereto as

follows:

A.  "Acid Gas" shall mean any gas that contains hydrogen sulfide and is generated at a

refinery by the regeneration of an amine solution.

B.  "Acid Gas Flaring" or "AG Flaring" shall mean the combustion of Acid Gas and/or

Sour Water Stripper Gas in an AG Flaring Device.

C.  "Acid Gas Flaring Device" or "AG Flaring Device" shall mean any device at the

Covered Refineries that is used for the purpose of combusting Acid Gas and/or Sour Water

Stripper Gas, except facilities in which gases are combusted to produce sulfur or sulfuric acid.

The AG Flaring Devices currently in service at the Covered Refineries are included in

Appendix A to the Consent Decree.  To the extent that, during the duration of the Consent

14

Decree, any Covered Refinery utilizes AG Flaring Devices other than those specified in Appendix A for the purpose of combusting Acid Gas and/or Sour Water Stripper Gas, those AG Flaring Devices shall be covered under this Consent Decree.

D. "Acid Gas Flaring Incident" or "AG Flaring Incident" shall mean the continuous or intermittent combustion of Acid Gas and/or Sour Water Stripper Gas that results in the emission of sulfur dioxide equal to, or in excess of, five-hundred (500) pounds in any twenty-four (24) hour period; provided, however, that if five-hundred (500) pounds or more of sulfur dioxide have been emitted in a twenty-four (24) hour period and flaring continues into subsequent, contiguous, non-overlapping twenty-four (24) hour period(s), each period of which results in emissions equal to or in excess of five-hundred (500) pounds of sulfur dioxide, then only one AG Flaring Incident shall have occurred.  Subsequent, contiguous, non-overlapping periods are measured from the initial commencement of flaring within the AG Flaring Incident.

E. "Alliance Refinery" shall mean the refinery owned and operated by COPC in Belle Chasse, Louisiana.

F. "AMP" or "Alternative Monitoring Plan" shall mean a monitoring plan, upon approval by EPA, that COPC may use in lieu of a regulatory monitoring requirement.

G. "Applicable Co-Plaintiff" or "Applicable State/Local Co-Plaintiff" shall mean the following states and/or local air quality districts with respect to the following refineries:

| | |
|---|---|
| Alliance Refinery | State of Louisiana through the LDEQ |
| Bayway Refinery | State of New Jersey on behalf of NJDEP |
| Ferndale Refinery | NWCAA |

15

| Trainer Refinery | Commonwealth of Pennsylvania through PaDEP |
| Wood River and Distilling West | State of Illinois on behalf of IEPA |

H. "Baseline Total Catalyst Addition Rate" shall mean the daily average Total Catalyst, in pounds per day, added to an FCCU during the baseline period of a $NO_x$ or $SO_2$ catalyst additive program.

I. "Bayway Crude Pipestill Heater" shall mean Heaters F-701 and F-751 at the Bayway Refinery which are connected through common ducting to a single stack.

J. "Bayway Refinery" shall mean the refinery owned and operated by COPC in the City of Linden, New Jersey.

K. "Borger Refinery" shall mean the refinery owned and operated by COPC in Borger, Texas.

L. "Calendar quarter" shall mean the three month period ending on March 31st, June 30th, September 30th, and December 31st.

M. "Capital Cost of a LoTOx System" or "Capital Cost" shall mean the projected installed costs, as determined during the design of the System, for a quench system, sufficient residence time, ozone injection ports, ozone generators, and oxygen supply.

N. "CEMS" shall mean continuous emissions monitoring system.

O. "CO" shall mean carbon monoxide.

P. "Combustion Units" shall mean the heaters, boilers, internal combustion engines, and combustion turbines at the Covered Refineries that are listed in Appendix B.

Q. "Consent Decree" or "Decree" or "CD" shall mean this Consent Decree, including any and all appendices attached to the Consent Decree.

16

R.  "COPC" shall mean the ConocoPhillips Company and its successors and assigns.

S.  "Co-Plaintiffs" shall mean the State of Illinois on behalf of IEPA, the State of

Louisiana on behalf of the LDEQ, the State of New Jersey on behalf of the NJDEP, the

Commonwealth of Pennsylvania on behalf of PaDEP, and the NWCAA.

T.  "Covered FCCUs" shall mean the following FCCUs that COPC owns and/or operates:

| | |
|---|---|
| Alliance Refinery: | Alliance FCCU |
| Bayway Refinery: | Bayway FCCU |
| Borger Refinery: | Borger FCCU 29 and Borger FCCU 40 |
| Ferndale Refinery: | Ferndale FCCU |
| LAR Wilmington: | LAR Wilmington FCCU |
| Sweeny Refinery: | Sweeny FCCU 3 and Sweeny FCCU 27 |
| Trainer Refinery: | Trainer FCCU |
| Wood River Refinery: | Wood River FCCU 1 and Wood River FCCU 2 |
| Wood River Distilling West: | Distilling West FCCU |

U.  "Covered Refineries" or "Covered Refinery" or "Refineries" or "Refinery" shall mean

the refineries owned and operated by COPC that are subject to the requirements of this Consent

Decree:  the Alliance Refinery, the Bayway Refinery, the Borger Refinery, the Ferndale Refinery,

the LAR Carson Plant, the LAR Wilmington Plant, the Rodeo Refinery, the Santa Maria

Refinery, the Sweeny Refinery, the Trainer Refinery, and the Wood River Refinery, including

Distilling West (except where Distilling West is specifically excluded).  The COPC refineries in

Westlake, Louisiana, Billings, Montana, and Ponca City, Oklahoma are covered by a consent

decree entered in Civil Action Number H-01-4430 in the Southern District of Texas and are not

covered by this Consent Decree.

17

V. "Current Generation Ultra-Low $NO_x$ Burners" shall mean those burners that are designed to achieve a $NO_x$ emission rate of 0.020 to 0.040 lb $NO_x$/mmBTU (HHV) when firing natural gas at 3% stack oxygen at full design load without air preheat, even if upon installation actual emissions exceed 0.040 lb $NO_x$/mmBTU (HHV).

W. "Date of Entry of the Consent Decree" or "Date of Entry" shall mean the date the Consent Decree is entered by the United States District Court for the Southern District of Texas.

X. "Date of Lodging of the Consent Decree" or "Date of Lodging" or "DOL" shall mean the date the Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Southern District of Texas.

Y. "Day" or "Days" as used herein shall mean a calendar day or days.

Z. "Distilling West" shall mean those assets of the Wood River Refinery that were owned and operated by Premcor prior to July 31, 2003, and all structures and equipment that COPC installed or used to integrate those assets with the Wood River Refinery. Provisions of this Consent Decree which apply to the Wood River Refinery also apply to Distilling West unless Distilling West is specifically excluded. A list of the assets that COPC purchased from Premcor is set forth in Appendix C.

AA. "Distilling West Combustion Units" shall mean Heater Nos. H-19, H-20, H-21, H-24, H-25, H-28, H-30, H-31, H-32, H-33, H-35, and H-36, and Boiler Nos. B-4, B-5, and B-6 physically located at Distilling West.

BB. "Enhanced SNCR" or "ESNCR" shall mean an air pollution control device consisting of ammonia injection with the addition of hydrogen as an enhanced reductant (or other reductants, reagents, or technology that will perform as well as or better than ammonia and

18

hydrogen on a particular CO Boiler, as demonstrated to and approved by EPA), but without a
catalyst bed, to reduce $NO_x$.

CC. "FCCU" as used herein shall mean a fluidized catalytic cracking unit and its
regenerator and associated CO boiler(s) (where present).

DD. "Ferndale Refinery" shall mean the refinery owned and operated by COPC in
Ferndale, Washington.

EE. "Flaring Device" shall mean either an AG and/or an HC Flaring Device. The Flaring
Devices that COPC owns and operates at the Covered Refineries are identified in Appendix A.

FF. "Fuel Oil" shall mean any liquid fossil fuel with a sulfur content of greater than
0.05% by weight.

GG. "Full Burn Operation" shall mean when essentially all of the CO produced in an
FCCU regenerator is converted to $CO_2$ inside the regenerator and there is excess $O_2$ present in the
regenerator flue gas. For Borger FCCUs 29 and 40, Full Burn Operation shall occur when less
than 500 ppm CO and greater than 0.2% $O_2$ by volume is present in the regenerator flue gas.

HH. "Hydrocarbon Flaring" or "HC Flaring" shall mean the combustion of
refinery-generated gases, except for Acid Gas and/or Sour Water Stripper Gas and/or Tail Gas, in
a Hydrocarbon Flaring Device.

II. "Hydrocarbon Flaring Device" or "HC Flaring Device" shall mean a device at the
Covered Refineries that is used to safely control (through combustion) any excess volume of a
refinery-generated gas other than Acid Gas and/or Sour Water Stripper Off Gas and/or Tail Gas.
The HC Flaring Devices currently in service at the Covered Refineries are included in
Appendix A to the Consent Decree, but shall also include the Paratone Flaring Device on the
grounds of the Bayway Refinery. To the extent that, during the duration of the Consent Decree,

19

any Covered Refinery utilizes HC Flaring Devices other than those specified in Appendix A or the Paratone Flaring Device for the purpose of combusting any excess of a refinery-generated gas other than Acid Gas and/or Sour Water Stripper Gas, those HC Flaring Devices shall be covered under this Consent Decree.

JJ. "Hydrocarbon Flaring Incident" or "HC Flaring Incident" shall mean the continuous or intermittent combustion of refinery-generated gases, except for Acid Gas or Sour Water Stripper Gas or Tail Gas, that results in the emission of sulfur dioxide equal to, or greater than five hundred (500) pounds in a twenty-four (24) hour period; provided, however, that if five-hundred (500) pounds or more of sulfur dioxide have been emitted in any twenty-four (24) hour period and flaring continues into subsequent, contiguous, non-overlapping twenty-four (24) hour period(s), each period of which results in emissions equal to or in excess of five-hundred (500) pounds of sulfur dioxide, then only one HC Flaring Incident shall have occurred. Subsequent, contiguous, non-overlapping periods are measured from the initial commencement of Flaring within the HC Flaring Incident.

KK. "Hydrotreater Outage" shall mean the period of time during which the operation of an FCCU is affected as a result of catalyst change-out operations or shutdowns required by ASME pressure vessel requirements or state boiler codes, or as a result of Malfunction, that prevents the hydrotreater from effectively producing the quantity and quality of feed necessary to achieve established FCCU emission performance.

LL. "IEPA" shall mean the Illinois Environmental Protection Agency and any successor departments or agencies of the State of Illinois.

MM. "Incremental Cost Effectiveness of a LoTOx System" or "Incremental Cost Effectiveness" shall mean:

20

$$\frac{[(acc + aoc)_1 - (acc + aoc)_2]}{[(ner)_1 - (ner)_2]}$$

Where:

acc    =    Annualized (15 year basis and 7% annual interest rate) Capital
            Cost of a LoTOx System ($/yr)

aoc    =    Annual Operating Cost of a LoTOx System ($/yr)

ner    =    $NO_x$ emissions reduced from an Uncontrolled Baseline (tons per
            year)

Condition 1 is the lower ppm design level and Condition 2 is the higher ppm
design level.

NN.  "LAR" or "Los Angeles Refinery" shall mean COPC's integrated business operation
that consists of the Los Angeles Refinery - Carson Plant and the Los Angeles Refinery -
Wilmington Plant.

OO.  "LAR Carson" or "LAR Carson Plant" shall mean the refinery owned and operated
by COPC in Carson, California.

PP.  "LAR Wilmington" or "LAR Wilmington Plant" shall mean the refinery owned and
operated by COPC in Wilmington, California.

QQ.  "LAR Wilmington Sulfuric Acid Plant" shall mean the sulfuric acid plant owned
and operated by COPC at the LAR Wilmington Plant.

RR.  "LDEQ" shall mean the Louisiana Department of Environmental Quality and any
successor departments or agencies of the State of Louisiana.

SS.  "Low $NO_x$ Burners" shall mean those burners designed to achieve a $NO_x$ emission
rate of 0.06 lb $NO_x$/mmBTU (HHV) or less when firing natural gas at 3% stack oxygen at full
design load without air preheat, even if upon installation actual emissions exceed 0.06 lb
$NO_x$/mmBTU (HHV).

TT. "Low $NO_x$ Combustion Promoter" shall mean a catalyst that is added to an FCCU consistent with Appendix D that minimizes $NO_x$ emissions while maintaining its effectiveness as a combustion promoter.

UU. "LoTOx System" shall mean a $NO_x$ control technology that includes a quench system, sufficient residence time, ozone injection ports, ozone generators, and oxygen supply, that uses the ozone to oxidize $NO_x$ which is then removed in a wet gas scrubber.

VV. "Malfunction" shall mean, as specified in 40 C.F.R. Part 60.2, "any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions."

WW. "Natural Gas Curtailment" shall mean a restriction imposed by a natural gas supplier limiting COPC's ability to obtain or use natural gas.

XX. "Next Generation Ultra-Low $NO_x$ Burners" or "Next Generation ULNBs" shall mean those burners that are designed to achieve a $NO_x$ emission rate of less than or equal to 0.020 lb $NO_x$/mmBTU (HHV) when firing natural gas at 3% stack oxygen at full design load without air preheat, even if upon installation actual emissions exceed 0.020 lb $NO_x$/mmBTU (HHV).

YY. "NJDEP" shall mean the New Jersey Department of Environmental Protection and any successor departments or agencies of the State of New Jersey.

ZZ. "$NO_x$" shall mean nitrogen oxides.

AAA. "$NO_x$ Additives" shall mean Low $NO_x$ Combustion Promoters and $NO_x$ Reducing Catalyst Additives.

BBB.  "$NO_x$ Reducing Catalyst Additive" shall mean a catalyst additive that is introduced to an FCCU to reduce $NO_x$ emissions through reduction or controlled oxidation of intermediates consistent with Appendix D.

CCC.  "NWCAA" shall mean the Northwest Clean Air Agency and any successor departments or agencies of the State of Washington.

DDD.  "Operating Costs of a LoTOx System" or "Operating Costs" shall mean all costs, necessary and directly related to the operation of a LoTOx System, for maintenance, personnel, consumables, chemicals, and utilities.  Utilities shall consist of electrical, steam, water supply, and compressed air costs.

EEE.  "PaDEP" shall mean the Pennsylvania Department of Environmental Protection and any successor departments or agencies of the Commonwealth of Pennsylvania.

FFF.  "Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral.

GGG.  "Paratone Flaring Device" shall mean the Flaring Device owned and operated by Infineum, located on the grounds of the Bayway Refinery, and occasionally used by COPC.

HHH.  "Parties" shall mean the United States, the Co-Plaintiffs, and COPC.

III.  "PEMS" shall mean predictive emissions monitoring systems developed in accordance with Appendix E to this Consent Decree.

JJJ.  "PM" shall mean particulate matter.

KKK.  "Pollutant Reducing Catalyst Additive" shall mean either a $NO_x$ Reducing Catalyst Additive or a $SO_2$ Reducing Catalyst Additive.

LLL.  "Premcor" shall mean The Premcor Refining Group, Inc. and its agents, successors and assigns.

23

MMM. "Rodeo Refinery" shall mean the refinery owned and operated by COPC in Rodeo, California.

NNN. "Root Cause" shall mean the primary cause(s) of an AG Flaring Incident(s), Hydrocarbon Flaring Incident(s), or a Tail Gas Incident(s) as determined through a process of investigation.

OOO. "Root Cause Analysis" or "RCA" shall mean the term used internally by COPC to undertake the investigation and reporting requirements associated with Acid Gas Flaring Incidents, Hydrocarbon Flaring Incidents, and Tail Gas Incidents.

PPP. "San Francisco Refinery" shall mean COPC's integrated business operation that consists of the Rodeo Refinery and the Santa Maria Refinery.

QQQ. "Santa Maria Refinery" shall mean the refinery owned and operated by COPC in Santa Maria, California.

RRR. "Scheduled Turnaround" shall mean the shutdown of any emission unit or control equipment that is scheduled at least six months in advance of the shutdown and the purpose of such shutdown is to (1) perform general equipment cleaning and repairs due to normal equipment wear and tear; (2) perform required equipment tests and internal inspections; (3) install any unit or equipment modifications/additions, or make provisions for a future modification or addition; and/or (4) perform normal end-of-run catalyst changeouts or refurbishments.

SSS. "Scrubber-based $NO_x$ Emission Reduction Technology" or "SNERT" shall mean a technology designed to achieve $NO_x$ emissions of 20 ppm on a 365-day rolling average basis (or designed to achieve an alternative $NO_x$ design concentration as approved by EPA pursuant to Paragraph 16), at 0% oxygen, from an FCCU flue gas stream, by chemically or biologically reacting $NO_x$ such that it subsequently is removed in a wet gas scrubber.

TTT. "Selective Catalytic Reduction" or "SCR" shall mean an air pollution control device consisting of ammonia injection and a catalyst bed to selectively catalyze the reduction of $NO_x$ with ammonia to nitrogen and water.

UUU. "7-day rolling average" and "365-day rolling average" shall mean the average emission rate during the preceding 7 or 365 days (as applicable) that the emission unit was operating.

VVV. "Sour Water Stripper Gas" or "SWS Gas" shall mean the gas produced by the process of stripping refinery sour water.

WWW. "$SO_2$" shall mean sulfur dioxide.

XXX. "$SO_2$ Reducing Catalyst Additive" shall mean a catalyst additive that is introduced to an FCCU to reduce $SO_2$ emissions by reduction and adsorption.

YYY. "Sulfur Recovery Plant" or "SRP" shall mean a process unit that recovers sulfur from hydrogen sulfide by a vapor phase catalytic reaction of sulfur dioxide and hydrogen sulfide.

ZZZ. "Sulfur Recovery Unit" or "SRU" shall mean a single component of a Sulfur Recovery Plant, commonly referred to as a Claus train.

AAAA. "Sweeny Refinery" shall mean the refinery owned and operated by COPC in Sweeny, Texas.

BBBB. "Tail Gas" shall mean exhaust gas from the Claus trains and the tail gas unit ("TGU") section of the SRP.

CCCC. "Tail Gas Incident" shall mean, for the purpose of this Consent Decree, combustion of Tail Gas that either is:

   i.    Combusted in a flare and results in 500 pounds or more of $SO_2$ emissions in any twenty-four (24) hour period ; or

25

    ii.    Combusted in a thermal incinerator and results in excess emissions of 500 pounds or more of $SO_2$ emissions in any twenty-four (24) hour period. Only those time periods which are in excess of a $SO_2$ concentration of 250 ppm (rolling twelve-hour average) shall be used to determine the amount of excess $SO_2$ emissions from the incinerator.

COPC will use good engineering judgment and/or other monitoring data during periods in which the $SO_2$ continuous emission analyzer has exceeded the range of the instrument or is out of service.

    DDDD. "Tail Gas Unit" or "TGU" shall mean a control system utilizing a technology for controlling emissions of sulfur compounds from a Sulfur Recovery Plant.

    EEEE. "Torch Oil" shall mean FCCU feedstock or cycle oils that are combusted in the FCC regenerator to assist in starting up or restarting the FCCU, to allow hot standby of the FCCU, or to maintain regenerator heat balance in the FCCU.

    FFFF. "Total Catalyst" shall mean all forms of catalyst added to the FCCU, including but not limited to base catalyst, equilibrium catalyst, and pollutant reducing catalyst.

    GGGG. "Total Catalyst Addition Rate" shall mean the Total Catalyst added to an FCCU in pounds per day.

    HHHH. "Total Cost Effectiveness of a LoTOx System" or "Total Cost Effectiveness" shall mean

$$\frac{acc + aoc}{ner}$$

Where:

acc  =  Annualized (15 year basis and 7 % annual interest rate) Capital Cost of a LoTOx System ($/yr)

aoc  =  Annual Operating Cost of a LoTOx System ($/yr)

26

ner   =   $NO_x$ emissions reduced from an Uncontrolled Baseline (tons per
year

IIII.  "Trainer Refinery" shall mean the refinery owned and operated by COPC in Trainer,
Pennsylvania.

JJJJ.  "Uncontrolled Baseline" shall mean (i) 1771 tons per year of $NO_x$ and 120 ppm of
$NO_x$ on a 365-day rolling average basis, at 0% oxygen, for the Alliance FCCU; and (ii) 481 tons
of $NO_x$ and 150 ppm of $NO_x$ on a 365-day rolling average basis, at 0% oxygen, for the Wood
River FCCU 1.

KKKK.  "Upstream Process Units" shall mean all amine contactors, amine regenerators,
and sour water strippers at the Covered Refineries, as well as all process units at the Covered
Refineries that produce gaseous or aqueous waste streams that are processed at amine contactors,
amine scrubbers, or sour water strippers.

LLLL.  "Weight % Pollutant Reducing Catalyst Additive Rate" shall mean:

$$\frac{\text{Amount of Pollutant Reducing Catalyst Additive in Pounds per Day}}{\text{Baseline Total Catalyst Addition Rate}} \times 100\%$$

MMMM.  "Wood River Refinery" shall mean the refinery owned and operated by COPC
in Roxana and Hartford, Illinois, including Distilling West, except where Distilling West is
specifically excluded.

27

## V. AFFIRMATIVE RELIEF/ENVIRONMENTAL PROJECTS

**A.      NO$_x$ Emissions Reductions from FCCUs**

12.      <u>Summary</u>.  COPC will implement a program as set forth in forth in

Paragraphs 13 - 54 to reduce NO$_x$ emissions from the Covered FCCUs, will incorporate lower

NO$_x$ emission limits at the Covered FCCUs into permits, and will demonstrate future compliance

with the lower emission limits through the use of CEMS.

13.      <u>Installation of an SCR System at Sweeny FCCU 27</u>.  COPC will complete

installation and begin operation of an SCR system at Sweeny FCCU 27 by no later than

December 31, 2009.  COPC will design the SCR system to achieve a NO$_x$ concentration of 20

ppmvd on a 365-day rolling average basis and 40 ppmvd on a 7-day rolling average basis, at 0%

oxygen.  By no later than June 30, 2010, COPC will comply with a NO$_x$ emission limit of 20

ppmvd on a 365-day rolling average basis and 40 ppmvd on a 7-day rolling average basis, at 0%

oxygen.

14.      <u>Installation of a Scrubber-Based NO$_x$ Emission Reduction Technology at Wood

River FCCU 1 and the Alliance FCCU (Paragraphs 14 - 26)</u>.  COPC will complete installation

and begin operation of a Scrubber-Based NO$_x$ Emission Reduction Technology ("SNERT") at

the Wood River FCCU 1 by no later than December 31, 2010, and at the Alliance FCCU by no

later than December 31, 2012.

15.      <u>NO$_x$ Design Concentration for SNERT</u>.  Except as provided in Paragraph 16,

COPC will design the SNERTs for the Wood River FCCU 1 and Alliance FCCU to achieve a

NO$_x$ concentration of 20 ppmvd on a 365-day rolling average basis at 0% oxygen ("20 ppm NO$_x$

Design Concentration").

28

16.    Alternative $NO_x$ Design Concentration for a SNERT. By no later than September 30, 2007, for the Wood River FCCU 1, and no later than September 30, 2009, for the Alliance FCCU, COPC may submit to EPA for approval a proposal to design a SNERT to a higher concentration than the 20 ppm $NO_x$ Design Concentration. In such proposal, COPC must demonstrate that a LoTOx System for the respective FCCU meets one or more of the following conditions:

(a)    The Total Cost Effectiveness for a LoTOx System at that FCCU to achieve 40 ppmvd $NO_x$ at 0% $O_2$ on a 365-day rolling average basis is greater than $20,000 per ton reduced;

(b)    The Incremental Cost Effectiveness for a LoTOx System at that FCCU for any 5 ppmvd increment between 40 ppmvd and 20 ppmvd at 0% $O_2$ is greater than $20,000 per ton reduced; and/or

(c)    The Total Cost Effectiveness for a LoTOx System at that FCCU to achieve 20 ppmvd $NO_x$ at 0% $O_2$ on a 365-day rolling average basis is greater than $10,000 per ton reduced.

If the Total Cost Effectiveness for a LoTOx System to achieve 40 ppmvd $NO_x$ at 0% $O_2$ on a 365-day rolling average basis is greater than $20,000 per ton reduced, then the Alternative $NO_x$ Design Concentration will be the lowest $NO_x$ design concentration at which this cost does not exceed $20,000 per ton reduced. If the Incremental Cost Effectiveness for a LoTOx System for any 5 ppmvd increment between 40 ppmvd and 20 ppmvd at 0% $O_2$ is greater than $20,000 per ton reduced, then the Alternative $NO_x$ Design Concentration will be the lower of: (i) the lowest $NO_x$ design concentration at which the Incremental Cost Effectiveness at one of the increments does not exceed $20,000 per ton reduced; or (ii) 40 ppmvd. If the Total Cost Effectiveness for a LoTOx System to achieve 20 ppmvd $NO_x$ at 0% $O_2$ on a 365-day rolling average basis is greater than $10,000 per ton reduced, then the Alternative $NO_x$ Design Concentration will be the lowest $NO_x$ design concentration at which this cost does not exceed $10,000 per ton reduced. COPC

will not design a SNERT to higher than 20 ppm $NO_x$ unless and until EPA approves an Alternative $NO_x$ Design Concentration.

17. If, by January 31, 2008, for the Wood River FCCU 1, or January 31, 2010, for the Alliance FCCU, COPC is not satisfied with EPA's response, or lack thereof, to a proposal submitted by COPC pursuant to Paragraph 16, then COPC will invoke the dispute resolution provisions of Section XV of this Decree between February 1 and February 28 of the applicable year. Failure by COPC to invoke Section XV during the month of February of the applicable year will constitute a waiver of COPC's right to dispute EPA's decision with respect to any Paragraph 16 proposal. For any disputes under this Paragraph, the informal period of negotiations will not extend beyond sixty (60) days.

18. Under either Paragraph 15 or 16, COPC will not be required to design a SNERT that: (i) results in ozone emissions in excess of that allowed by state permitting; (ii) violates the OSHA Process Safety Management requirements to: (1) operate equipment according to recognized and generally good engineering practices pursuant to 29 C.F.R. § 1910.119(d)(3)(ii), or (2) place the equipment consistent with facility siting determinations performed during the initial process hazard analysis pursuant to 29 C.F.R. § 1910.119(e); and/or (iii) results in wastewater discharges in excess of that allowed by the affected Refinery's then-current wastewater permit unless COPC can make changes at the Refinery to meet the then-current limits or unless the state permitting authority agrees to raise permit limits.

19. Design Submissions. By no later than the dates set forth in the table in Paragraph 20 ("Paragraph 20 Table"), COPC will submit to EPA and the Applicable Co-Plaintiff proposed process design specifications for the SNERT based on the 20 ppmvd $NO_x$ Design Concentration, or, if approved by EPA, the Alternative $NO_x$ Design Concentration. COPC will

propose process design specifications that, at a minimum, include appropriate design parameters
(for example, if COPC selects a LoTOx System, COPC will include consideration of the design
parameters set forth in Appendix F for LoTOx Systems). COPC and EPA agree to consult with
each other on the development of the process design specifications for the SNERT prior to
COPC's submission of final proposal.

     20.    Provided that COPC meets the deadlines for the submission of the process design
specifications, EPA will provide comments, if any, to COPC by no later than the dates set forth
in the Paragraph 20 Table. If EPA provides comments on the proposed design, COPC will
submit to EPA, for final approval, with a copy to the Applicable Co-Plaintiff, a modified
proposal that addresses EPA's comments by the dates set forth in the Paragraph 20 Table. If
EPA does not provide comments on or approval of the final design by the dates set forth in the
Paragraph 20 Table, COPC will proceed with the implementation of the final design. COPC will
notify EPA and the Applicable Co-Plaintiff of any substantial changes to the SNERT design
which may affect the performance of the SNERT by no later than thirty (30) days after COPC
decides to change the design.

| FCCU | (a) COPC elects to submit a proposal under ¶ 16 | (b) COPC invokes dispute resolution (if necessary) | (c) COPC submits proposed process design specifications | (d) EPA comments on proposed process design specifications | (e) COPC submits modified process design specifications to address EPA comments | (f) EPA comments on the modified process design specifications |
|---|---|---|---|---|---|---|
| Alliance | No later than Sept. 30, 2009 | Feb. 2010 | No later than June 30, 2010 | 90 days after the submission in (c) | 60 days after the comments in (d) | 60 days after the submission in (e) |
| Wood River 1 | No later than Sept. 30, 2007 | Feb. 2008 | No later than June 30, 2008 | 90 days after the submission in (c) | 60 days after the comments in (d) | 60 days after the submission in (e) |

21.    SNERT Optimization Studies and Demonstration Periods (Paragraphs 21 - 26).

By no later than the dates set forth in the table in Paragraph 25 ("Paragraph 25 Table"), COPC
will begin a six (6) month study to optimize the performance of the SNERT to minimize $NO_x$
emissions from the Alliance and Wood River 1 FCCUs ("SNERT Optimization Study"). During
the SNERT Optimization Study, COPC will evaluate the effect of operating parameters on $NO_x$
emissions, will monitor $NO_x$ emissions and the operating parameters to identify optimum
operating levels for the parameters that minimize $NO_x$ emissions, and will operate the respective
SNERT in a way that minimizes $NO_x$ emissions.

22.    By no later than the dates set forth in the Paragraph 25 Table, COPC will submit a
report to EPA and the Applicable Co-Plaintiff that describes the results of the SNERT
Optimization Study ("SNERT Optimization Study Report") and identifies the optimal operating
levels for use in a demonstration period. In the SNERT Optimization Study Report, COPC will
submit a protocol for an eighteen (18) month demonstration of the SNERT at the optimized
operating levels.

32

23.     By no later than the dates set forth in the Paragraph 25 Table, COPC will begin an eighteen (18) month demonstration of the SNERT at the optimized operating levels. During the demonstration period, COPC will continue to evaluate the effect of operating parameters on $NO_x$ emissions and will make all reasonable efforts to operate at the optimal operating levels for those parameters that COPC can control.

24.     If either or both of COPC's SNERTs is a LoTOx System, then during the optimization and demonstration period, COPC will not be required to add ozone at a rate that results in total costs for the sum of (i) electricity for ozone generation and oxygen production; and (ii) oxygen, for operation of a LoTOx System, in excess of:

(a)     For the first twelve (12) months of the optimization and demonstration periods, a running average annualized cost, calculated on a monthly basis, of $4.4 million (to be adjusted for inflation at the time the optimization period begins) for the Alliance FCCU, and $1.2 million (to be adjusted for inflation at the time the optimization period begins) for the Wood River FCCU 1; and

(b)     For each calendar month after month twelve (12) of the optimization and demonstration periods, a twelve (12) month rolling average cost of $4.4 million (to be adjusted for inflation at the time the optimization period begins) for the Alliance FCCU, and $1.2 million (to be adjusted for inflation at the time the optimization period begins) for the Wood River FCCU 1, on an annualized basis, calculated monthly.

For purposes of this Paragraph, the "running average annualized cost" will be calculated monthly according to the following equation:

$$\frac{[\sum_{1}^{n} \text{cost}_n]}{n} \quad \text{x} \quad 12$$

Where "n" = month number within the optimization and demonstration period

33

25.   By no later than the dates set forth in the Paragraph 25 Table, COPC will submit a written report ("SNERT Demonstration Report") to EPA and the Applicable Co-Plaintiff that sets forth the results of the demonstration.

| FCCU | COPC commences SNERT Optimiz. Study | COPC commences SNERT demonstration | COPC submits Optimization Study Report | COPC completes SNERT demonstration | COPC submits SNERT Demonstration Report |
|------|------|------|------|------|------|
| Alliance | 12/31/12 | 6/30/13 | 8/31/13 | 12/31/14 | 3/31/15 |
| Wood River 1 | 12/31/10 | 6/30/11 | 8/31/11 | 12/31/12 | 3/31/13 |

26.   In the SNERT Optimization and Demonstration Reports, COPC will identify the relevant operating parameters and their levels that result in the maximum reduction of $NO_x$ emissions for each respective FCCU.  Each Report will include, at a minimum, the following information on a daily average basis (unless otherwise noted below):

(a)   CO Boiler combustion temperature and flue gas flow rate (estimated or measured);

(b)   Coke burn rate in pounds per hour;

(c)   FCCU feed rate in barrels per day;

(d)   FCCU feed API gravity;

(e)   Estimated percentage or directly measured percentage (if available) of each type of FCCU feed component (i.e. atmospheric gas oil, vacuum gas oil, atmospheric tower bottoms, vacuum tower bottoms, etc.);

(f)   Amount and type of hydrotreated feed (i.e. volume % of feed that is hydrotreated and the type of hydrotreated feed such as AGO, VGO, CGO, ATB, VTB, etc.);

(g)   FCCU feed nitrogen (on a weekly basis) and FCCU feed sulfur (on a daily basis) content, as a weight %;

(h)   CO boiler firing rate and fuel type, if applicable

(i)   Ozone addition rates (if applicable);

34

(j)     Quench system inlet and outlet temperature (if applicable);

(k)     Power usage and, if applicable, oxygen usage;

(l)     Hourly average $NO_x$ and $O_2$ concentrations at the point of emission to the atmosphere by means of a CEMS;

(m)     $NO_x$ concentrations at the inlet to the SNERT during the Optimization Study (a process analyzer calibrated in accordance with manufacturer's recommendations may be used); and

(n)     Any other parameters that COPC identifies before the end of the optimization and/or demonstration period.

The SNERT Optimization and Demonstration Reports also will include a detailed description, with appropriate calculations, of the times, if any, during the optimization and demonstration periods where COPC asserts that the conditions set forth in Paragraph 24 were met.

27.     COPC may notify EPA by no later than December 31, 2012 (for Wood River), and by no later than December 31, 2014 (for Alliance), of COPC's agreement to comply with $NO_x$ emission limits of 20 ppmvd on a 365-day rolling average basis and 40 ppmvd on a 7-day rolling average basis, at 0% oxygen, effective on December 31, 2012, for Wood River FCCU 1, and effective on December 31, 2014, for the Alliance FCCU.  If COPC makes such a notification, Paragraphs 14 - 26 no longer will apply for that FCCU after the date of the notification.

28.     Installation and Operation of Enhanced SNCR at the Bayway FCCU; Borger FCCUs 29 and 40; the Ferndale FCCU; the Trainer FCCU; and Wood River FCCU 2 (Paragraphs 28 - 37).  COPC will complete installation and will begin operation of an Enhanced SNCR system (or alternative technology at the Borger FCCUs 29 and 40 as provided for in Paragraph 39) at the following FCCUs by no later than the following dates:

35

| Bayway FCCU | December 31, 2006 |
| Borger FCCU 29 | December 31, 2006 |
| Borger FCCU 40 | December 31, 2012 |
| Ferndale FCCU | December 31, 2010 |
| Trainer FCCU | December 31, 2006 |
| Wood River FCCU 2 | December 31, 2012 |

29. Enhanced SNCR Design. COPC will design the Enhanced SNCR systems to reduce $NO_x$ emissions as much as feasible. By no later than the dates in the Table in Paragraph 30 ("Paragraph 30 Table"), COPC will submit to EPA and the Applicable Co-Plaintiff proposed process design specifications for the Enhanced SNCR systems. In that submission, COPC will propose process design specifications that, at a minimum, include consideration of the design parameters identified in Appendix F to this Consent Decree. COPC and EPA agree to consult with each other on the development of the process design specifications for the Enhanced SNCR systems prior to COPC's submission of final proposals.

30. Provided that COPC meets the deadlines for the submission of the process design specifications, EPA will provide comments, if any, to COPC by no later than the dates set forth in the Paragraph 30 Table. Prior to submitting its comments by the dates set forth in the Paragraph 30 Table, EPA will provide the Applicable Co-Plaintiff an opportunity for comment. If EPA provides comments on the proposed design, COPC will submit to EPA, for final approval, with a copy to the Applicable Co-Plaintiff, a modified proposal that addresses EPA's comments by the dates set forth in the Paragraph 30 Table. If EPA does not provide comments on or approval of the final design by the dates in the Paragraph 30 Table, COPC may proceed with the implementation of the final design. Thereafter, COPC will notify EPA and the

36

Applicable Co-Plaintiff of any substantial changes to the Enhanced SNCR design which may

affect the performance of the Enhanced SNCR system by no later than 30 days after COPC

decides to change the design.

| FCCU | (a)<br>COPC submits proposed process design specifications | (b)<br>EPA comments on proposed process design specifications | (c)<br>COPC submits modified process design specifications to address EPA comments | (d)<br>EPA comments on the modified process design specifications |
|---|---|---|---|---|
| Bayway | No later than 30 days after DOL | No later than 60 days after the submission in (a) | No later than 30 days after the comments in (b) | No later than 30 days after the submission in (c) |
| Borger 29 | No later than 3/31/05 | 45 days after the submission in (a) | 30 days after the comments in (b) | 15 days after the submission in (c) |
| Borger 40 | No later than 12/31/10 | 2 mos. after the submission in (a) | 2 mos. after the comments in (b) | 2 mos. after the submission in (c) |
| Ferndale | No later than 12/31/08 | 2 mos. after the submission in (a) | 2 mos. after the comments in (b) | 2 mos. after the submission in (c) |
| Trainer | No later than Sept. 30, 2004 | No later than 30 days after the submission in (a) | No later than 30 days after the comments in (b) | No later than 30 days after the submission in (c) |
| Wood River 2 | No later than 12/31/10 | 2 mos. after the submission in (a) | 2 mos. after the comments in (b) | 2 mos. after the submission in (c) |

31.    Enhanced SNCR Optimization Studies and Demonstration Periods (Paragraphs

31- 37). By no later than the dates set forth in the table in Paragraph 35 ("Paragraph 35 Table"),

COPC will submit to EPA and the Applicable Co-Plaintiff a protocol for implementing an

Enhanced SNCR optimization study at each of the respective FCCUs. This protocol will include,

at a minimum, consideration of the operating parameters set forth in Appendix F to this Consent

Decree.

32.     By no later than the dates set forth in the Paragraph 35 Table, COPC will begin a six (6) month study, in accordance with the protocol, to optimize the performance of the ESNCR system to minimize $NO_x$ emissions from the respective FCCUs ("ESNCR Optimization Study"). During the ESNCR Optimization Study, COPC will evaluate the effect of operating parameters on $NO_x$ emissions, will monitor $NO_x$ emissions and the operating parameters to identify optimum operating levels for the parameters that minimize $NO_x$ emissions, and will operate the respective FCCU and ESNCR system in a way that minimizes $NO_x$ emissions as much as feasible without interfering with FCCU conversion or processing rates.

33.     By no later than the dates set forth in the Paragraph 35 Table, COPC will submit a report to EPA and the Applicable Co-Plaintiff that describes the results of the ESNCR Optimization Study ("ESNCR Optimization Study Report") and identifies optimal operating levels for use in the demonstration period.  COPC will propose, for EPA approval and for review and comment by the Applicable Co-Plaintiff, optimal operating levels for use in the demonstration period.  EPA will not provide its approval of COPC's proposed operating levels prior to the commencement of the demonstration period.  If, during the demonstration period, EPA disapproves COPC's proposed operating levels, extensions of all relevant deadlines, as agreed by the parties, may result.

34.     By no later than the dates set forth in the Paragraph 35 Table, COPC will begin an eighteen (18) month demonstration of the ESNCR system at the optimized operating levels. During the demonstration period, COPC will continue to evaluate the effect of operating parameters on $NO_x$ emissions and will operate the respective FCCU and ESNCR in a way that minimizes $NO_x$ emissions as much as feasible without interfering with FCCU conversion or processing rates.

38

35.   By no later than the dates set forth in the Paragraph 35 Table, COPC will submit a written report ("ESNCR Demonstration Report") to EPA and the Applicable Co-Plaintiff that sets forth the results of the demonstration.

| FCCU | COPC submits proposed protocol for ESNCR Optimiz. Study | COPC commences ESNCR Optimiz. Study | COPC commences ESNCR demon- stration | COPC submits ESNCR Optimization Study Report | COPC completes ESNCR demon- stration | COPC submits ESNCR Demonstration Report |
|------|------|------|------|------|------|------|
| Bayway | 9/30/06 | 3/31/07 | 9/30/07 | 11/30/07 | 3/31/09 | 5/31/09 |
| Borger 29 | 9/30/06 | 3/31/07 | 9/30/07 | 11/30/07 | 3/31/09 | 5/31/09 |
| Borger 40 | 9/30/12 | 3/31/13 | 9/30/13 | 11/30/13 | 3/31/15 | 5/31/15 |
| Ferndale | 9/30/10 | 3/31/11 | 9/30/11 | 11/30/11 | 3/31/13 | 5/31/13 |
| Trainer | 9/30/06 | 3/31/07 | 9/30/07 | 11/30/07 | 3/31/09 | 5/31/09 |
| Wood River 2 | 9/30/12 | 3/31/13 | 9/30/13 | 11/30/13 | 3/13/15 | 5/31/15 |

36.   In the ESNCR Optimization and Demonstration Reports, COPC will identify the relevant operating parameters and their levels that result in the maximum reduction of $NO_x$ emissions from each respective FCCU. The Reports will include, at a minimum, the following information on a daily average basis (except where a different period is specified):

(a)   CO Boiler combustion temperature profiles (at existing measurement locations) and flue gas flow rate (estimated or measured);

(b)   Coke burn rate in pounds per hour;

(c)   FCCU feed rate in barrels per day;

(d)   FCCU feed API gravity;

(e)   Estimated percentage or directly measured percentage (if available) of each type of FCCU feed component (i.e. atmospheric gas oil, vacuum gas oil, atmospheric tower bottoms, vacuum tower bottoms, etc.);

39

(f)   Amount and type of hydrotreated feed (i.e. volume % of feed that is hydrotreated
and the type of hydrotreated feed such as AGO, VGO, CGO, ATB, VTB, etc.);

(g)   FCCU feed nitrogen (on a weekly basis) and FCCU feed sulfur (on a daily basis)
content, as a weight %;

(h)   CO boiler firing rate and fuel type, if applicable;

(i)   Reductant addition rates and ammonia slip (ppm), where applicable;

(j)   Power usage;

(k)   Reductant carrier medium;

(l)   Hourly average $NO_x$ and $O_2$ concentrations at the point of emission to the
atmosphere and, for $O_2$ only, in the flue gas leaving the CO Boiler; and

(m)   Any other parameters that COPC identifies before the end of the demonstration
period.

Upon request by EPA, COPC will submit any additional data that EPA determines it needs to
evaluate the ESNCR Optimization Study and demonstration.

37.   For purposes of complying with Paragraph 36(l), COPC will utilize a CEMS to
determine the $NO_x$ and $O_2$ concentrations at the point of emission to the atmosphere.  COPC will
determine the $O_2$ concentrations in the flue gas after combustion in the CO boiler by process
analyzer(s) calibrated in accordance with the manufacturer's recommendations.  COPC will
report the data or measurements in electronic format.

38.   Accepting Hard Limits.  For the Bayway FCCU, Borger FCCUs 29 and 40, the
Ferndale FCCU, the Trainer FCCU, and/or Wood River FCCU 2, COPC may notify EPA and the
Applicable Co-Plaintiff at any time prior to the due date for the submission of the ESNCR
Demonstration Report for the respective FCCU of COPC's agreement to comply with $NO_x$
emission limits of 20 ppmvd on a 365-day rolling average basis and 40 ppmvd on a 7-day rolling
average basis, at 0% oxygen, effective no later than the due date of the submission of the ESNCR

Demonstration Report for the respective FCCU. If COPC makes such a notification, Paragraphs 28 - 37 will no longer apply for that FCCU after the date of the notification.

39.     By no later than March 31, 2005, COPC may notify EPA of COPC's: (i) intent to decommission the CO Boilers at the Borger FCCUs, convert Borger FCCUs 29 and 40 to Full Burn Operation, and utilize high-pressure hydrotreating at greater than 1200 pounds per square inch ("psi") for the FCCU feed; and (ii) agreement to comply with the provisions of this Paragraph instead of Paragraphs 28 - 37. If COPC makes this notification, then by no later than December 31, 2007, COPC will (i) decommission its Borger CO Boilers, (ii) convert Borger FCCUs 29 and 40 to Full Burn Operation, and (iii) utilize high-pressure hydrotreating at greater than 1200 psi for 100% of the FCCU feed until the $NO_x$ emission limits for Borger FCCUs 29 and 40 have been established pursuant to Paragraphs 50 - 51. COPC will commence the implementation of a $NO_x$ Additives program at Borger FCCUs 29 and 40 in accordance with the requirements of Paragraphs 41 - 47 by no later than the dates set forth in those Paragraphs. As part of the next turnaround of the respective FCCU after conversion to Full Burn Operation, COPC will consider changes to the FCCU that may be necessary to: (i) minimize afterburn while using Low $NO_x$ Combustion Promoter; and (ii) comply with CO emission limits while using Low $NO_x$ Combustion Promoter. If COPC notifies EPA of its intent to comply with this Paragraph, then the requirements of Paragraphs 28 - 37 will not apply to Borger FCCUs 29 and 40. Nothing in this Paragraph releases COPC from its obligations to obtain any necessary permits required for making changes at the Borger Refinery.

40.     Continued Shutdown of the Distilling West FCCU and Surrender of the Illinois State Permits. The Distilling West FCCU currently is shut down. This shutdown was not and is not required by this Consent Decree. By no later than thirty (30) days after the Date of Lodging

41

of the Consent Decree, COPC will surrender to the State of Illinois the following permits relating

to the Distilling West FCCU: 75120010 (operating permit for the FCCU); 94040141

(construction permit for FCCU modifications); and 01100084 (construction permit for FCCU

wet gas scrubber). If at any time prior to the termination of this Decree, COPC seeks to start up

the Distilling West FCCU, COPC will apply for appropriate permits with the State of Illinois as a

new emission source as defined in 35 Ill. Adm. Code 201.102 and meet all emission limits then

applicable to new emission sources.

41.    Use of $NO_x$ Reducing Catalyst Additives and Low $NO_x$ Combustion Promoters at

Sweeny FCCU 3, the LAR Wilmington FCCU, and, if applicable, Borger FCCUs 29 and 40

(Paragraphs 41 - 47). The reduction of $NO_x$ emissions from the LAR Wilmington FCCU,

Sweeny FCCU 3, and Borger FCCUs 29 and 40 (if COPC provides notification under

Paragraph 39) will be accomplished by the use of $NO_x$ Reducing Catalyst Additives and Low

$NO_x$ Combustion Promoters as described in Paragraphs 42 - 47.

42.    Hydrotreating at the Sweeny Refinery. By no later than June 1, 2006, COPC will

have completed modifications to the operations of its Sweeny Refinery such that the feed to

Sweeny FCCUs 3 and 27 is high-pressured hydrotreated at greater than 1200 pounds per square

inch. COPC will high-pressure hydrotreat 100% of the feed at Sweeny FCCU 3 until both the

$NO_x$ and $SO_2$ emission limits have been established pursuant to Paragraphs 50 - 51 ($NO_x$) and

Paragraphs 69 - 70 ($SO_2$). COPC will high-pressure hydrotreat 90% of the feed at Sweeny

FCCU 27 until the $SO_2$ emissions limits have been established pursuant to Paragraphs 69 - 70.

43.    $NO_x$ Baseline Data and $NO_x$ Model. By the dates set forth below, for the

following baseline time periods, for the following FCCUs, COPC will submit to EPA and the

Applicable Co-Plaintiff two reports: (1) a report of twelve (12) months of baseline data; and

42

(2) a report describing a model to predict uncontrolled $NO_x$ concentration and mass emission rate:

| FCCU | Baseline Start | Baseline End | Report |
|------|----------------|--------------|--------|
| LAR Wilmington FCCU | 12/31/05 | 12/31/06 | 2/28/07 |
| Sweeny FCCU 3 | 6/30/06 | 6/30/07 | 8/31/07 |
| Borger 29 and 40 (if COPC provides notification under Paragraph 39) | 12/31/07 | 12/31/08 | 2/28/09 |

The baseline data will include all data considered in development of the model on a daily average basis and, at a minimum, the following data on a daily average basis:

(a)     Regenerator dense bed, dilute phase, cyclone and flue gas temperatures;

(b)     Coke burn rate in pounds per hour;

(c)     FCCU feed rate in barrels per day;

(d)     FCCU feed API gravity;

(e)     Estimated percentage or directly measured percentage (if available) of each type of FCCU feed component (i.e. atmospheric gas oil, vacuum gas oil, atmospheric tower bottoms, vacuum tower bottoms, etc.);

(f)     Amount and type of hydrotreated feed (i.e. volume % of feed that is hydrotreated and the type of hydrotreated feed such as AGO, VGO, CGO, ATB, VTB, etc.);

(g)     FCCU feed sulfur and basic nitrogen content, as a weight %, except that if, after thirty (30) days of daily monitoring of the FCCU feed nitrogen content, the variability of the feed nitrogen content, as measured by the standard deviation of the data, is less than 30% of the mean, then COPC may commence monitoring and recording the feed nitrogen content through daily sampling composited on a weekly basis for the remainder of the baseline period; in addition, COPC may propose, for EPA approval, alternate sulfur and nitrogen data collection requirements.

(h)     CO boiler firing rate and fuel type, if applicable;

(i)     CO boiler combustion temperature, if applicable;

(j)     Total Catalyst addition rate;

(k)     $NO_x$ and $SO_2$ Reducing Catalyst Additive and addition rates, conventional combustion promoter addition rates, and Low $NO_x$ Combustion Promoter addition rates;

(l)     Hourly and daily $SO_2$, $NO_x$, CO, and $O_2$ concentrations at the point of emission to the atmosphere by means of a CEMS; and

(m)     Any other parameters that COPC identifies before the end of the demonstration period.

Upon request by EPA, COPC will submit any additional data that EPA determines it needs to evaluate the model. The report describing the model will include a description of how the model was developed including which parameters were considered, why parameters were eliminated, efforts and results of model validation, and the statistical methods used to arrive at the equation to predict uncontrolled $NO_x$ concentration and mass emission rate.

44.     Use of Low NOx Combustion Promoter.

(a)     By no later than June 30, 2005, COPC will identify and notify EPA as to which EPA-approved brand of Low $NO_x$ Combustion Promoter COPC will use at the LAR Wilmington FCCU. Beginning December 31, 2006, COPC will discontinue use of conventional combustion promoter and begin using this Low $NO_x$ Combustion Promoter at the LAR Wilmington FCCU. COPC agrees that for the LAR Wilmington FCCU, there will be no optimization period to determine the effectiveness of Low $NO_x$ Combustion Promoter. Prior to the establishment of $NO_x$ limits pursuant to Paragraphs 50 - 51, COPC will not discontinue use of Low $NO_x$ Combustion Promoter at the LAR Wilmington FCCU unless and until EPA approves the discontinuance.

(b)     By no later than the dates set forth in the Table in Paragraph 44(d) ("Paragraph 44(d) Table"), COPC will identify for EPA approval the brand of Low $NO_x$ Combustion Promoter that COPC proposes to use for Sweeny FCCU 3 and, if applicable, Borger FCCUs 29 and 40, together with COPC's proposed functional equivalent rate, as determined by Appendix D.

(c)     If EPA has approved a Low $NO_x$ Combustion Promoter brand prior to the completion of the baseline period, then immediately upon completion of the baseline period, and in accordance with the protocol set forth in Appendix D, COPC will commence a program for the full replacement of its conventional

44

combustion promoter with Low $NO_x$ Combustion Promoter. COPC will complete this program by no later than the dates set forth in the Paragraph 44(d) Table. If EPA has not approved a brand prior to the completion of the baseline period, then all relevant deadlines will be modified as agreed by the parties.

(d) COPC will submit a report on the above-described program by no later than the dates set forth in the Paragraph 44(d) Table. This report will identify the levels of afterburn and the reductions in $NO_x$ emissions from the baseline at the historical level of use of conventional Pt-based combustion promoter and when Low $NO_x$ Combustion Promoter is used.

| FCCU | COPC identifies Low $NO_x$ Combustion Promoter and Functional Equivalent Rate | Replacement of Convent-ional Promoter with Low $NO, CO$ Promoter Starts | Replacement of Convent-ional Promoter with Low $NO, CO$ Promoter is Complete | Report Due |
|---|---|---|---|---|
| Sweeny FCCU 3 | 12/31/06 | 6/30/07 | 12/31/07 | 3/1/08 |
| Borger 29 and 40 (if COPC provides notification under Paragraph 39) | 6/30/08 | 12/31/08 | 6/30/09 | 8/31/09 |

(e) COPC may use conventional combustion promoter on an intermittent basis during the optimization and demonstration periods as needed to avoid unsafe operation of the FCCU regenerator and to comply with CO emission limits. COPC will undertake appropriate measures and/or adjust operating parameters with the goal of eliminating such use. Notwithstanding the foregoing, COPC will not be required to adjust operating parameters in a way that would limit conversion or processing rates. Within thirty (30) days of using conventional combustion promoter, COPC will submit a report to EPA documenting when and why COPC used the conventional combustion promoter and the actions, if any, taken to return to the minimized level of use.

(f) COPC may discontinue use of Low $NO_x$ Combustion Promoters if COPC demonstrates to EPA that COPC has adjusted other parameters and that such promoter does not adequately control afterburn and/or causes CO emissions to approach or exceed applicable limits. Prior to the establishment of $NO_x$ limits pursuant to Paragraphs 50 - 51, COPC will not discontinue use of Low $NO_x$ Combustion Promoters unless and until EPA approves the discontinuance. Notwithstanding the foregoing, COPC will not be required to adjust operating parameters in a way that would limit FCCU conversion or processing rates.

45.  NO$_x$ Reducing Catalyst Additives – Short Term Trials

(a)  By no later than the dates set forth in the table in Paragraph 45(c), COPC will identify for EPA approval at least two commercially available brands of NO$_x$ Reducing Catalyst Additives, for each FCCU, that COPC proposes to use for short term trials and submit a protocol to EPA for conducting the trials.

(b)  COPC will propose use of at least two brands of NO$_x$ Reducing Catalyst Additives that are likely to perform the best in each FCCU. EPA will base its approval or disapproval on its assessment of the performance of the proposed brand of additives in other FCCUs, the similarity of those FCCUs to COPC's FCCUs, as well as any other relevant factors, with the objective of conducting trials of the brands of NO$_x$ Reducing Catalyst Additives likely to have the best performance in reducing NO$_x$ emissions. In the event that COPC submits less than two approvable brands of additives, EPA will identify other approved additives brands to COPC.

(c)  If EPA has approved two brands of NO$_x$ Reducing Catalyst Additives by no later than the "trial start" date set forth below, then COPC will commence and complete the trials of those two brands and will submit a report to EPA that describes the performance of each brand that was trialed by the following dates for the following FCCUs:

| FCCU | COPC IDs 2 Additives and Submits Protocol | Trial Starts | Trial Ends | Report Date |
|---|---|---|---|---|
| LAR Wilmington FCCU | 6/30/05 | 12/31/06 | 6/30/07 | 7/31/07 |
| Sweeny FCCU 3 | 6/30/06 | 12/31/07 | 6/30/08 | 7/31/08 |
| Borger 29 and 40 | 12/31/08 | 6/30/09 | 12/31/09 | 1/31/10 |

(if COPC provides notification under Paragraph 39)

If EPA has not approved two brands of additives by the "trial start" date, then all relevant deadlines will be modified as agreed by the parties.

(d)  In the report on the short-term trials, COPC will propose to use the best performing brand of additive as measured by percentage of NO$_x$ emissions reduced and the concentration to which NO$_x$ emissions were reduced in the trials, taking into account all relevant factors. EPA will either approve the proposed brand of additive or approve another brand of additive that was trialed for use in the optimization study. In approving an additive, EPA will consider the impact of the additive on the processing rate and/or the conversion capability if such

46

impacts cannot be reasonably compensated for by adjusting operating parameters. Upon request by EPA, COPC will submit any additional available data that EPA determines it needs to evaluate the trials.

46. $NO_x$ Reducing Catalyst Additives – Optimization Study and Report

(a) By no later than the dates set forth in the table in Paragraph 46(c) ("Paragraph 46(c) Table"), COPC will submit, for EPA approval, a proposed protocol consistent with the requirements of Appendix D for optimization studies to establish the optimized $NO_x$ Reducing Catalyst Additive addition rates. The protocol will include methods to calculate effectiveness, cost effectiveness, methods for baseloading, and percent additive used at each increment tested.

(b) If EPA has approved a brand of $NO_x$ Reducing Catalyst Additive by no later than the "Optimization Start" date set forth in the Paragraph 46(c) Table, then COPC will commence and complete the optimization study of the $NO_x$ Reducing Catalyst Additive in accordance with the approved protocol and Appendix D by no later than the dates set forth in the Paragraph 46(c) Table. If EPA has not approved a brand of $NO_x$ Reducing Catalyst Additive by no later than the "Optimization Start" date, then all relevant deadlines will be modified as agreed by the parties.

(c) By no later than the following dates, COPC will report the results of the $NO_x$ Reducing Catalyst Additive Optimization Study and propose, for EPA approval, optimized addition rates of all catalysts and promoters to be used for the demonstration period.

| FCCU | Protocol Due | Optimization Start | Optimization End | Report Due |
|---|---|---|---|---|
| LAR Wilmington FCCU | 3/31/06 | 9/30/07 | 3/31/08 | 4/30/08 |
| Sweeny FCCU 3 | 3/31/07 | 9/30/08 | 3/31/09 | 4/30/09 |
| Borger 29 and 40 (if COPC provides notification under Paragraph 39) | 9/30/09 | 3/31/10 | 9/30/10 | 10/31/10 |

Upon request by EPA, COPC will submit any additional data that EPA determines it needs to evaluate the $NO_x$ Reducing Catalyst Additive Optimization Study.

(d) During the Optimization Study, COPC will successively add $NO_x$ Reducing Catalyst at increments of 1.0, 1.5, and 2.0 Weight % $NO_x$ Reducing Catalyst Additive. Once a steady state has been achieved at each increment, COPC will evaluate the performance of the $NO_x$ Reducing Catalyst Additive in terms of $NO_x$ emissions reductions and projected annualized costs. The final Optimized $NO_x$

Reducing Catalyst Additive Addition Rate, in pounds per day, will occur at the addition rate where either:

(i)     The FCCU meets 20 ppmvd $NO_x$ at 0% $O_2$ on a 365-day rolling average, in which case COPC will agree to accept a limit of 20 ppmvd $NO_x$ at 0% $O_2$ on a 365-day rolling average basis at the conclusion of the demonstration period;

(ii)    Incremental Pickup Factor <1.8 lb NOx/lb additive;

(iii)   Total cost of the additive > $10,000/ton $NO_x$ removed; or

(iv)    FCCU is operating at 2.0% Weight % $NO_x$ Reducing Catalyst Additive.

If an additive limits (i) the FCCU's ability to control CO emissions to below 500 ppmvd CO corrected to 0% $O_2$ on a 1-hour basis; and/or (ii) the FCCU's processing rate; and/or (iii) the FCCU's conversion capability, and this (these) effect(s) cannot be reasonably compensated for by adjusting other parameters, then the additive rate will be reduced to a level at which the additive no longer causes such effects.

47.     $NO_x$ Reducing Catalyst Additives – Demonstration Period and Report

(a)     By no later than the dates set forth in the table in Paragraph 47(b), while using Low $NO_x$ Combustion Promoter (if it is needed and effective), COPC will commence and complete a demonstration of the EPA-approved $NO_x$ Reducing Catalyst Additive at the optimized addition rates that COPC proposes unless EPA proposes different optimized addition rates. Delays by EPA in approving the optimized addition rate may result in extensions of the demonstration period and extensions of relevant deadlines as agreed by the parties.

(b)     By no later than the following dates, COPC will report to EPA and the Applicable Co-Plaintiff the results of the demonstration ("$NO_x$ Additive Demonstration Report"). The $NO_x$ Additive Demonstration Report will include, at a minimum, the $NO_x$ and $O_2$ CEMS data recorded during the demonstration period and all baseline data on a daily average basis for the demonstration period.

| FCCU | Demonstration Start | Demonstration End | Report Due |
|---|---|---|---|
| LAR Wilmington | 3/31/08 | 12/31/10 | 3/1/11 |
| Sweeny 3 | 3/31/09 | 12/31/11 | 3/1/12 |
| Borger 29 and 40 (if COPC provides notification under Paragraph 39) | 9/30/10 | 3/31/12 | 5/31/12 |

(c)     During the demonstration period, COPC will both physically add NO$_x$ Reducing
Catalyst Additive and operate each FCCU, CO Boiler (where installed) and FCCU
feed hydrotreaters (where installed) in a manner that minimizes NO$_x$ emissions to
the extent practicable without interfering with conversion or processing rates.

48.     COPC may notify EPA at any time prior to the following dates of COPC's

agreement to comply with NO$_x$ emission limits of 20 ppmvd on a 365-day rolling average basis

and 40 ppmvd on a 7-day rolling average basis, at 0% oxygen, effective on the following dates:

| FCCU | Date |
|------|------|
| LAR Wilmington | 3/1/11 |
| Sweeny 3 | 3/1/12 |
| Borger 29 and 40 | 5/31/12 |

(if COPC provides notification under Paragraph 39)

If COPC makes such a notification, Paragraphs 41 - 47 will no longer apply for the affected

FCCU(s) after the date of the notification.

49.     Establishing NO$_x$ Emissions Limits for all Covered FCCUs but Sweeny FCCU 27.

Except where COPC has notified EPA of its intent to comply with NO$_x$ emission limits of 20

ppmvd on a 365-day rolling average basis and 40 ppmvd on a 7-day rolling average basis, at 0%

oxygen, COPC will propose a short-term (*e.g.*, 3-hour, 24-hour, or 7-day rolling average) and a

long term (365-day rolling average) concentration-based (ppmvd) NO$_x$ emission limits as

measured at 0% O$_2$ for the following FCCUs in the following reports:

| | |
|---|---|
| Alliance FCCU | SNERT Demonstration Report |
| Wood River FCCU 1 | |
| | |
| Bayway FCCU | ESNCR Demonstration Report |
| Ferndale FCCU | |
| Trainer FCCU | |
| Wood River FCCU 2 | |

49

| Borger FCCUs 29 and 40 | ESNCR Demonstration Report, or if COPC makes notification pursuant to Paragraph 39, the $NO_x$ Additive Demonstration Report |
| --- | --- |
| Sweeny FCCU 3 LAR Wilmington FCCU | $NO_x$ Additive Demonstration Report |

COPC may propose alternative emissions limits to be applicable during Hydrotreater Outages or other alternative operating scenarios. COPC will comply with the emission limits it proposes for each FCCU beginning immediately upon submission of the applicable report for that FCCU. COPC will continue to comply with these limits unless and until COPC is required to comply with the emissions limits set by EPA pursuant to Paragraphs 50 - 51 below. Upon request by EPA, COPC will submit any additional, available data that EPA determines it needs to evaluate the demonstration.

50.     EPA will use the data collected about each FCCU during the baseline period, the optimization period, and the demonstration period, as well as all other available and relevant information, to establish limits for $NO_x$ emissions for the following FCCUs: Alliance, Bayway, Borger 29 and 40, Ferndale, Sweeny 3, Trainer, LAR Wilmington, and Wood River 1 and 2. EPA will establish a short term (*e.g.*, 3-hour, 24-hour, or 7-day rolling average) and a 365-day rolling average concentration-based (ppmvd) $NO_x$ emission limits corrected to 0% $O_2$. EPA will determine the limits based on: (i) the level of performance during the baseline, optimization, and demonstration periods; (ii) a reasonable certainty of compliance; (iii) degradation of control efficiency caused by length of run; and (iv) any other available and relevant information. EPA will not establish a 365-day rolling average concentration-based $NO_x$ limit lower than 20 ppm where COPC installs a LoTOx System.

50

51.     EPA will notify COPC of its determination of the concentration-based $NO_x$
emissions limit and averaging times for each FCCU, including how and whether emissions
during Hydrotreater Outages are included in the 365-day rolling average. EPA may establish
alternative emissions limits to be applicable during Hydrotreater Outages or other alternative
operating scenarios. If EPA agrees with COPC's proposed limits, COPC will continue to comply
with these limits. If EPA proposes different limits that COPC does not dispute within thirty (30)
days of receiving notification from EPA, COPC will comply with the EPA-established limits by
no later than thirty (30) days after notice. If COPC disputes the EPA-established limits, COPC
will invoke the dispute resolution provisions of this Decree by no later than thirty (30) days after
EPA's notice of the limits. During the period of dispute resolution, COPC will operate the
SNERT and/or ESNCR systems, where applicable, under optimized operating conditions, and/or
will continue to add $NO_x$ Additives at the optimized rates, where applicable.

52.     EPA will establish $NO_x$ emission limits under Paragraphs 50 - 51 of this Consent
Decree after an opportunity for comment by the Applicable Co-Plaintiff.

53.     $NO_x$ emissions during periods of startup, shutdown, or Malfunction of an FCCU,
or during periods of Malfunction of an SCR, SNERT, ESNCR system, or Pollutant Reducing
Catalyst Additive system will not be used in determining compliance with the short-term $NO_x$
emission limits established pursuant to Paragraphs 13 and 51, provided that during such periods
COPC implements good air pollution control practices to minimize $NO_x$ emissions.

54.     Demonstrating Compliance with FCCU $NO_x$ Emission Limits. Beginning no later
than the dates set forth below for each of the following FCCUs, COPC will use $NO_x$ and $O_2$
CEMS to monitor performance of the FCCU.

51

| FCCU | CEMS |
|------|------|
| Alliance | 6/30/05 |
| Bayway | DOL |
| Borger 29 | 9/30/05 |
| Borger 40 | 9/30/05 |
| Ferndale | DOL |
| LAR Wilmington | DOL |
| Sweeny 3 | 6/30/05 |
| Sweeny 27 | DOL |
| Trainer | 12/31/06 |
| Wood River 1 | DOL |
| Wood River 2 | DOL |

The CEMS will be used to demonstrate compliance with the respective $NO_x$ emission limits established pursuant to this Section V.A. of this Consent Decree. COPC will make CEMS data available to EPA and the Applicable Co-Plaintiff upon demand as soon as practicable. COPC will install, certify, calibrate, maintain, and operate all CEMS required by this Paragraph in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMS (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B. For the Alliance, Borger, Sweeny, and LAR Wilmington FCCUs, unless Appendix F is otherwise required by the NSPS, state law or regulation, or a permit or approval, in lieu of the requirements of 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, COPC must conduct either a Relative Accuracy Audit ("RAA") or a Relative Accuracy Test Audit

("RATA") on each CEMS at least once every three (3) years.  COPC must also conduct Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RATA is not performed.

**B.     SO₂ Emissions Reductions from FCCUs**

55.     <u>Summary</u>.  COPC will implement a program to reduce $SO_2$ emissions from the Covered FCCUs as set forth in Paragraphs 56 - 75.  COPC will incorporate the lower $SO_2$ emission limits at the Covered FCCUs into permits and will demonstrate future compliance with the lower emission limits through the use of CEMS.

56.     <u>Continued Operation of a Wet Gas Scrubber at the Bayway and Ferndale FCCUs</u>. COPC will continue the operation of the existing wet gas scrubbers at the Bayway and Ferndale FCCUs.  By no later than the Date of Lodging, COPC will comply with an $SO_2$ concentration limit at the Bayway and Ferndale FCCUs of 25 ppmvd or lower on a 365-day rolling average basis and 50 ppmvd or lower on a 7-day rolling average basis, at 0% oxygen.

57.     <u>Installation and Operation of Wet Gas Scrubbers at the Alliance, Borger 29, Borger 40, Trainer, Wood River 1 and Wood River 2 FCCUs.</u>  By no later than the following dates for the following FCCUs, COPC will complete installation and begin operation of a WGS:

| | |
|---|---|
| Alliance | December 31, 2009 |
| Borger 29 | December 31, 2006 |
| Borger 40 | December 31, 2015 |
| Trainer | December 31, 2006 |
| Wood River 1 | December 31, 2008 |
| Wood River 2 | December 31, 2012 |

COPC will design the WGSs to achieve an $SO_2$ concentration of 25 ppmvd or lower on a 365-day rolling average basis and 50 ppmvd on a 7-day rolling average basis, each corrected to

0% $O_2$. By no later than the dates set forth above, COPC will comply with an $SO_2$ concentration limit of 25 ppmvd or lower on a 365-day rolling average basis and 50 ppmvd or lower on a 7-day rolling average basis, each corrected to 0% $O_2$.

58.    Borger FCCUs 29 and 40. By no later than March 31, 2005, COPC may notify EPA of COPC's: (i) intent to decommission the CO Boilers at the Borger FCCUs, convert Borger FCCUs 29 and 40 to Full Burn Operation, and utilize high-pressure hydrotreating at greater than 1200 pounds per square inch ("psi") for the FCCU feed; and (ii) agreement to comply with $SO_2$ emission limits of 25 ppmvd or lower on a 365-day rolling average basis and 50 ppmvd or lower on a 7-day rolling average basis, at 0% $O_2$. If COPC makes this notification, then by no later than December 31, 2007, COPC will (i) decommission its Borger CO Boilers; (ii) convert Borger FCCUs 29 and 40 to Full Burn Operation; (iii) utilize high-pressure hydrotreating at greater than 1200 psi for 100% of the FCCU feed until the $NO_x$ emission limits for Borger FCCUs 29 and 40 have been established pursuant to Paragraphs 50 - 51; and (iv) comply with $SO_2$ emission limits of 25 ppmvd or lower on a 365-day rolling average basis and 50 ppmvd or lower on a 7-day rolling average basis, at 0% $O_2$. If COPC makes this notification, the requirements of Paragraph 57 will not apply to Borger FCCUs 29 and 40. Nothing in this Paragraph releases COPC from its obligations to obtain any necessary permits required for making changes at the Borger Refinery.

59.    Complying with Hard Limits for $SO_2$, $NO_x$ and PM at the Alliance FCCU. By no later than December 31, 2009, COPC may notify EPA and LDEQ of COPC's agreement to comply with the following emission limits:

$NO_x$:    20 ppmvd on a 365-day rolling average basis and 40 ppmvd on a 7-day rolling average basis, at 0% oxygen;

SO$_2$:   25 ppmvd on a 365-day rolling average basis and 50 ppmvd on a 7-day rolling average basis, at 0% oxygen;

PM:   0.5 pounds PM per 1000 pounds coke burned on a 3-hour average basis.

If COPC makes that notification, COPC will comply with the SO$_2$ and PM limits in this Paragraph 59 by no later than December 31, 2009, and the NO$_x$ limits in this Paragraph 59 by no later than June 30, 2010.  If COPC makes that notification, COPC will no longer be required to comply with Paragraphs 14 - 26 and Paragraph 57, as those Paragraphs apply to the Alliance FCCU, after the date of the notification.

60.   Continued Shutdown of the Distilling West FCCU and Surrender of the Illinois State Permits.  The Distilling West FCCU currently is shut down.  This shutdown was and is not required by this Consent Decree.  By no later than thirty (30) days after the Date of Lodging of the Consent Decree, COPC will surrender to the State of Illinois the following permits relating to the Distilling West FCCU:  75120010 (operating permit for the FCCU); 94040141 (construction permit for FCCU modifications); and 01100084 (construction permit for FCCU wet gas scrubber).  If at any time prior to the termination of this Decree, COPC seeks to start up the Distilling West FCCU, COPC will apply for appropriate permits with the State of Illinois as a new emission source as defined in 35 Ill. Adm. Code 210.102, and, in such permit application, will agree to install and operate a wet gas scrubber on the Distilling West FCCU designed to achieve an SO$_2$ concentration of 25 ppmvd or lower on a 365-day rolling average basis and 50 ppmvd on a 7-day rolling average basis, each at 0% O$_2$.  By no later than one-hundred eighty (180) days after the startup of the WGS and at all times thereafter, COPC will demonstrate compliance with an SO$_2$ emission limit of 25 ppmvd or lower on a 365-day rolling average basis

55

and 50 ppmvd on a 7-day rolling average basis, each at 0% $O_2$.  COPC will demonstrate

compliance as set forth in Paragraph 73.

61.  <u>Use of $SO_2$ Reducing Catalyst Additives at the LAR Wilmington FCCU and
Sweeny FCCUs 3 and 27:  Summary</u>.  The reduction of $SO_2$ emissions from the LAR

Wilmington FCCU and Sweeny FCCUs 3 and 27 will be accomplished by the use of $SO_2$

Reducing Catalyst Additives as described in Paragraphs 62 - 66.

62.  <u>$SO_2$ Baseline Data and $SO_2$ Model</u>.  By the dates set forth below, for the following

baseline time periods, for the following FCCUs, COPC will submit to EPA and the Applicable

Co-Plaintiff two reports:  (1) a report of twelve (12) months of baseline data and (2) a report

describing a model to predict uncontrolled $SO_2$ concentration and mass emission rate:

| FCCU | Baseline Start | Baseline End | Report |
|------|----------------|--------------|--------|
| LAR Wilmington | 12/31/05 | 12/31/06 | 2/28/07 |
| Sweeny 3 | 6/30/06 | 6/30/07 | 8/31/07 |
| Sweeny 27 | 6/30/06 | 6/30/07 | 8/31/07 |

The baseline data will include all data considered in development of the model on a daily average

basis, and, at a minimum, the data required in Paragraph 43.  Upon request by EPA, COPC will

submit any additional data that EPA determines it needs to evaluate the model.  The report

describing the model will include a description of how the model was developed including which

parameters were considered, why parameters were eliminated, efforts and results of model

validation, and the statistical methods used to arrive at the equation to predict uncontrolled $SO_2$

concentration and mass emission rate.

63.   SO₂ Reducing Catalyst Additives – Short Term Trials

(a)   By no later than the dates set forth in the table in Paragraph 63(c), COPC will identify for EPA approval at least two commercially available brands of SO₂ Reducing Catalyst Additives, for each FCCU, that COPC proposes to use for short term trials and submit a protocol to EPA for conducting the trials.

(b)   COPC will propose use of at least two brands of SO₂ Reducing Catalyst Additives that are likely to perform the best in each FCCU. EPA will base its approval or disapproval on its assessment of the performance of the proposed brands of additives in other FCCUs, the similarity of those FCCUs to COPC's FCCUs, as well as any other relevant factors, with the objective of conducting trials of the brands of SO₂ Reducing Catalyst Additives likely to have the best performance in reducing SO₂ emissions. In the event that COPC submits less than two approvable brands of additives, EPA will identify other approved additives brands to COPC.

(c)   If EPA has approved two brands of SO₂ Reducing Catalyst Additives by no later than the "trial start" date set forth below, then COPC will commence and complete the trials of those two brands and will submit a report to EPA that describes the performance of each brand that was trialed by the following dates for each of the following FCCUs:

| FCCU | COPC IDs 2 Additives and submits Protocol | Trial Starts | Trial Ends | Report Date |
|---|---|---|---|---|
| LAR Wilmington | 9/30/07 | 3/31/08 | 9/30/08 | 11/30/08 |
| Sweeny 3 | 9/30/08 | 3/31/09 | 9/30/09 | 11/30/09 |
| Sweeny 27 | 12/31/06 | 6/30/07 | 12/31/07 | 3/1/08 |

If EPA has not approved two brands of additives by the "trial start" date, then subsequent deadlines will be modified as agreed by the parties.

(d)   In the report on the short-term trials, COPC will propose to use the best performing brand of additive as measured by percentage of SO₂ emissions reduced and the concentration to which SO₂ emissions were reduced in the trials, taking into account all relevant factors. EPA will either approve the proposed brand of additive or approve another brand of additive that was trialed for use in the optimization study. In approving an additive, EPA will consider the impact of the additive on the processing rate and/or the conversion capability if such impacts cannot be reasonably compensated for by adjusting operating parameters. Upon

request by EPA, COPC will submit any additional available data that EPA determines it needs to evaluate the trials.

64.   SO$_2$ Reducing Catalyst Additives – Optimization Study and Report

(a)   By no later than the dates set forth in the table in Paragraph 64(c) ("Paragraph 64(c) Table"), COPC will submit, for EPA approval, a proposed protocol consistent with the requirements of Appendix D for optimization studies to establish the optimized SO$_2$ Reducing Catalyst Additive addition rates. The protocol will include methods to calculate effectiveness, methods for baseloading, and percent additive used at each increment tested.

(b)   If EPA has approved a brand of SO$_2$ Reducing Catalyst Additive by no later than the "Optimization Start" date set forth in the Paragraph 64(c) Table, then COPC will commence and complete the optimization study of the SO$_2$ Reducing Catalyst Additive in accordance with the approved protocol and Appendix D by no later than the dates set forth in the Paragraph 64(c) Table. If EPA has not approved a brand of SO$_2$ Reducing Catalyst Additive by no later than the "Optimization Start" date, then subsequent deadlines will be modified as agreed by the parties.

(c)   By no later than the following dates, COPC will report the results of the SO$_2$ Reducing Catalyst Additive Optimization Study and propose, for EPA approval, optimized addition rates of all catalysts to be used for the demonstration period.

| FCCU | Protocol Due | Optimization Start | Optimization End | Report Due |
|---|---|---|---|---|
| LAR Wilmington | 6/30/08 | 12/31/08 | 6/30/09 | 7/31/09 |
| Sweeny 3 | 6/30/09 | 12/31/09 | 6/30/10 | 7/31/10 |
| Sweeny 27 | 9/30/07 | 3/31/08 | 9/30/08 | 10/31/08 |

Upon request by EPA, COPC will submit any additional data that EPA determines it needs to evaluate the SO$_2$ Reducing Catalyst Additive Optimization Study.

(d)   During the Optimization Study, COPC will successively add SO$_2$ Reducing Catalyst at increments of 5.0, 6.7, 8.4, and 10.0 Weight % SO$_2$ Reducing Catalyst Additive. Once a steady state has been achieved at each increment, COPC will evaluate the performance of the SO$_2$ Reducing Catalyst Additive in terms of SO$_2$ emissions reductions. The final Optimized SO$_2$ Reducing Catalyst Additive Addition Rate, in pounds per day, will occur at the addition rate where either:

(i)   The FCCU meets 25 ppmvd SO$_2$ at 0% O$_2$ on a 365-day rolling average, in which case COPC will agree to accept a limit of 25 ppmvd SO$_2$ at 0% O$_2$

on a 365-day rolling average basis at the conclusion of the demonstration period;

(ii)   Incremental Pickup Factor <2.0 lb $SO_2$/lb additive; or

(iii)   FCCU is operating at 10.0% Weight % $SO_2$ Reducing Catalyst Additive.

If an additive limits the processing rate or the conversion capability in a manner that cannot be reasonably compensated for by adjustment of other parameters, then the additive level will be reduced to a level at which the additive no longer causes such effects.

65.   SO₂ Reducing Catalyst Additives – Demonstration Period and Report

(a)   By no later than dates set forth in the table in Paragraph 65(b), COPC will commence and complete a demonstration of the EPA-approved $SO_2$ Reducing Catalyst Additive at the optimized addition rates that COPC proposes unless EPA proposes different optimized addition rates. Delays by EPA in approving the optimized addition rate may result in extensions of the demonstration period and extensions of relevant deadlines as agreed by the parties.

(b)   By no later than the following dates, COPC will report to EPA and the Applicable Co-Plaintiff the results of the demonstrations ("$SO_2$ Additive Demonstration Report"). The $SO_2$ Additive Demonstration Report will include, at a minimum, the $SO_2$ and oxygen CEMS data recorded during the demonstration period and all baseline data on a daily average basis for the demonstration period.

| FCCU | Demonstration Start | Demonstration End | Report Due |
|------|---------------------|-------------------|------------|
| LAR Wilmington | 6/30/09 | 12/31/10 | 3/1/11 |
| Sweeny 3 | 6/30/10 | 12/31/11 | 3/1/12 |
| Sweeny 27 | 9/30/08 | 3/31/10 | 5/31/10 |

(c)   During the demonstration period, COPC will both physically add $SO_2$ Reducing Catalyst Additive and operate each FCCU, CO Boiler (where applicable) and FCCU feed hydrotreaters (where applicable) in a manner that minimizes $SO_2$ emissions to the extent practicable without interfering with conversion or processing rates.

66.   If at any time during the trial, optimization, and/or demonstration of $SO_2$

Reducing Catalyst Additives at Sweeny FCCU 27, COPC demonstrates that the use of $SO_2$

Reducing Catalyst Additives significantly impairs COPC's ability to comply with the $NO_x$ emission limits set for Sweeny FCCU 27 under Paragraph 13 of this Decree and cannot be reasonably compensated for by adjusting parameters other than the $SO_2$ Reducing Catalyst Additive, then EPA may approve a reduction of the $SO_2$ Reducing Catalyst Additive addition rate to a level at which the additive no longer causes such effects.

67.     COPC may notify EPA at any time prior to the following dates of COPC's agreement to comply with $SO_2$ emission limits of 25 ppmvd on a 365-day rolling average basis and 50 ppmvd on a 7-day rolling average basis, at 0% oxygen, effective on the following dates:

| FCCU | Date |
|------|------|
| LAR Wilmington | 3/1/11 |
| Sweeny 3 | 3/1/12 |
| Sweeny 27 | 5/31/10 |

If COPC makes such a notification, Paragraphs 61 - 66 will no longer apply for the affected FCCU(s) after the date of the notification.

68.     Establishing Final $SO_2$ Emission Limits at the LAR Wilmington FCCU, Sweeny FCCU 3 and Sweeny FCCU 27.   Except where COPC has notified EPA of its intent to comply with $SO_2$ emission limits of 25 ppmvd on a 365-day rolling average basis and 50 ppmvd on a 7-day rolling average basis, at 0% oxygen, COPC will propose, in each $SO_2$ Additive Demonstration Report, final 7-day rolling average and 365-day rolling average concentration-based (ppmvd) $SO_2$ emission limits, at 0% oxygen, for the LAR Wilmington FCCU and Sweeny FCCUs 3 and 27.   COPC may propose alternative emissions limits to be applicable during Hydrotreater Outages, startup of the FCCU, shutdown of the FCCU, or other

60

alternative operating scenarios. COPC will comply with the emission limits it proposes for each FCCU beginning immediately upon submission of the applicable report for that FCCU. COPC will continue to comply with these limits unless and until COPC is required to comply with the emissions limits set by EPA pursuant to Paragraphs 69 - 70 below. Upon request by EPA, COPC will submit any additional, available data that EPA determines it needs to evaluate the demonstration.

69.     EPA will use the data collected about each FCCU during the baseline period, the optimization period, and the demonstration period, as well as all other available and relevant information, to establish limits for $SO_2$ emissions for the LAR Wilmington FCCU and for Sweeny FCCUs 3 and 27. EPA will establish a 7-day rolling average and a 365-day rolling average concentration-based (ppmvd) $SO_2$ emission limits at 0% oxygen. EPA will determine the limits based on: (i) the level of performance during the baseline, optimization, and demonstration periods; (ii) a reasonable certainty of compliance; and (iii) any other available and relevant information.

70.     EPA will notify COPC of its determination of the concentration-based $SO_2$ emissions limit and averaging times for each FCCU, including how and whether emissions during Hydrotreater Outages are included in the 365-day rolling average. EPA may establish alternative emissions limits to be applicable during Hydrotreater Outages, startup of the FCCU, shutdown of the FCCU, or other alternative operating scenarios. If EPA agrees with COPC's proposed limits, COPC will continue to comply with these limits. If EPA proposes different limits that COPC does not dispute within thirty (30) days of receiving notification from EPA, COPC will comply with the EPA-established limits by no later than thirty (30) days after notice. If COPC disputes the EPA-established limits, COPC will invoke the dispute resolution

provisions of this Decree by no later than thirty (30) days after EPA's notice of the limits.
During the period of dispute resolution, COPC will continue to add $SO_2$ Reducing Catalyst
Additives at the optimized rates and comply with any approved Hydrotreater Outage plan.

71.   EPA will establish $SO_2$ emission limits under Paragraphs 69 - 70 of this Consent
Decree after an opportunity for comment by the Applicable Co-Plaintiff.

72.   $SO_2$ emissions during periods of startup, shutdown, or Malfunction of an FCCU
controlled by catalyst additives, or during periods of Malfunction of an FCCU controlled by a
WGS, or during periods of Malfunction of a WGS or Pollutant Reducing Catalyst Additive
system will not be used in determining compliance with the short-term $SO_2$ emission limits
established pursuant to Paragraphs 56, 57, and 70, provided that during such periods COPC
implements good air pollution control practices to minimize $SO_2$ emissions.

73.   Demonstrating Compliance with FCCU $SO_2$ Emission Limits.  Beginning no later
than the dates set forth below for each of the following FCCUs, COPC will use $SO_2$ and $O_2$
CEMS to monitor performance of the FCCU.

| FCCU | CEMS |
|------|------|
| Alliance | 6/30/05 |
| Bayway | DOL |
| Borger 29 | 9/30/05 |
| Borger 40 | 9/30/05 |
| Ferndale | DOL |
| LAR Wilmington | DOL |
| Sweeny 3 | 6/30/05 |
| Sweeny 27 | DOL |

| | |
|---|---|
| Trainer | 12/31/06 |
| Wood River 1 | DOL |
| Wood River 2 | DOL |

The CEMS will be used to demonstrate compliance with the respective $SO_2$ emission limits established pursuant to Section V.B. of this Consent Decree. COPC will make CEMS data available to EPA and the Applicable Co-Plaintiff upon demand as soon as practicable. COPC will install, certify, calibrate, maintain, and operate all CEMS required by this Paragraph in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMS (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B. For the Alliance, Borger, Sweeny, and LAR Wilmington FCCUs, unless Appendix F is otherwise required by the NSPS, state law or regulation, or a permit or approval, in lieu of the requirements of 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, COPC must conduct either a Relative Accuracy Audit ("RAA") or a Relative Accuracy Test Audit ("RATA") on each CEMS at least once every three (3) years. COPC must also conduct Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RATA is not performed.

74. Hydrotreater Outages. For the following FCCUs, by the following dates, COPC will submit to EPA for approval, with a copy to the Applicable Co-Plaintiff, a plan for the operation of the FCCUs (including associated air pollution control equipment) during Hydrotreater Outages in a way that minimizes emissions as much as practicable.

| FCCU | Date |
|------|------|
| LAR Wilmington FCCU | 3/31/05 |
| Sweeny FCCU 3 | 6/30/06 |
| Sweeny FCCU 27 | 6/30/06 |

The plan will, at a minimum, consider the use of low sulfur feed, storage of hydrotreated feed, and an increase in additive addition rate. The short-term $SO_2$ emission limits established pursuant to this Consent Decree at the LAR Wilmington FCCU and Sweeny FCCUs 3 and 27 will not apply during periods of FCCU feed Hydrotreater Outages provided that COPC is in compliance with the plan and is maintaining and operating its FCCUs in a manner consistent with good air pollution control practices. The short-term $NO_x$ emission limits established pursuant to this Consent Decree at the LAR Wilmington FCCU and Sweeny FCCU 3 will not apply during periods of FCCU feed Hydrotreater Outages provided that COPC is in compliance with the plan and is maintaining and operating its FCCUs in a manner consistent with good air pollution control practices. COPC will comply with the approved plan at all times, including periods of startup, shutdown, and Malfunction of the hydrotreater. In addition, in the event that COPC asserts that the basis for a specific Hydrotreater Outage is a shutdown (where no catalyst changeout occurs) required by ASME pressure vessel requirements or applicable state boiler requirements, COPC will submit a report to EPA and the Applicable Co-Plaintiff that identifies the relevant requirements and justifies COPC's decision to implement the shutdown during the selected time period.

75.     At such time as COPC accepts an emission limit of 0.5 pound PM per 1000 pounds of coke burned on a 3-hour average basis for both Borger FCCUs 29 and 40 as determined by the testing protocol in Paragraph 59, COPC may submit and utilize hydrotreater

outage plans for Borger FCCUs 29 and 40 consistent with the requirements of Paragraph 74. The Hydrotreater Outage Plans will be submitted to EPA for approval at the same time COPC submits the PM performance results for Borger FCCUs 29 and 40.

### C.   PM Emissions Reductions from FCCUs.

76.   COPC will implement a program to reduce PM emissions from the Covered FCCUs as set forth in Paragraphs 77 - 83. COPC will incorporate the lower PM emission limits into permits and will demonstrate future compliance with the lower emission limits through PM testing as specified in this Section V.C.

77.   PM Emission Limits for the Bayway, Borger 29, Borger 40, Trainer, Wood River 1 and Wood River 2 FCCUs. COPC will continue to operate the wet gas scrubber at the Bayway Refinery and will design the wet gas scrubbers at the Borger 29, Borger 40, Trainer, Wood River 1 and Wood River 2 FCCUs to achieve an emission limit of 0.5 pound PM per 1000 pounds of coke burned on a 3-hour average basis. To the extent that, under Paragraph 58 of this Consent Decree, COPC does not install wet gas scrubbers at Borger FCCUs 29 and 40, this requirement will not apply. By no later than the following dates for the following FCCUs, COPC will comply with an emission limit of 0.5 pound PM per 1000 pounds of coke burned on a 3-hour average basis determined by the testing protocol in Paragraph 83:

|  |  |
| --- | --- |
| Bayway | Date of Lodging |
| Borger 29 (if applicable) | December 31, 2006 |
| Borger 40 (if applicable) | December 31, 2015 |
| Trainer | December 31, 2006 |

|                 |                   |
|-----------------|-------------------|
| Wood River 1    | December 31, 2008 |
| Wood River 2    | December 31, 2012 |

78.  <u>PM Emission Limits at the Alliance FCCU</u>.  By no later than December 31, 2009, COPC will comply with an emission limit of 0.5 pound PM per 1000 pounds of coke burned on a 3-hour average basis determined by the testing protocol in Paragraph 83.

79.  <u>PM Control Measures and Emission Limits at the Ferndale FCCU</u>

(a)  By no later than December 31, 2006, COPC will complete modifications to the existing wet gas scrubber at the Ferndale FCCU to comply with an emission limit of no greater than 0.5 pounds PM per 1000 pounds of coke burned on a 3-hour average basis.  By no later than June 30, 2007, COPC will comply with an emission limit of 0.5 pound PM per 1000 pounds of coke burned on a 3-hour average basis at the Ferndale FCCU.  By no later than June 30, 2007, COPC will conduct a performance test to demonstrate compliance with the emission limit of 0.5 pounds PM per 1000 pounds of coke burned on a 3-hour average basis by using 40 C.F.R. Part 60 Appendix A Method 5B.

(b)  For the period between the Date of Lodging and the date that COPC demonstrates compliance with the emission limits pursuant to the requirements of Paragraph 79(a), COPC will comply with the following conditions at the Ferndale FCCU:

> (i)  COPC will comply with an emission limit of 0.8 pound PM per 1000 pounds of coke burned on a 3-hour average basis when operating three scrubber water recirculation pumps;

> (ii)  COPC will operate all three scrubber water recirculation pumps to the maximum extent practicable except during a pump Malfunction or periods of scheduled maintenance of a pump.  COPC will optimize the operation of the pumps in order to minimize the periods of scheduled maintenance. COPC will not schedule maintenance on more than one pump at any given time and scheduled maintenance of a pump will not exceed one week. During a pump Malfunction, COPC will use best efforts to take all steps

66

necessary (including pump replacement) to minimize the amount of time the FCCU wet gas scrubber operates with fewer than three pumps.

(iii) By no later than six (6) months after the Date of Lodging, and once during each subsequent six (6) month period until December 31, 2006, COPC will conduct a performance test to demonstrate compliance with the emission limit set forth in Paragraph 79(b)(i) by using 40 C.F.R. Part 60 Appendix A Method 5B.

(c) By no later than December 31, 2004, COPC will submit a complete application to the Washington Department of Ecology for a revision to the existing PSD permit for the Ferndale FCCU to add PM and PM-10 emission limits to that permit. The permit application will propose an emission limit no higher than 0.5 pound PM per 1000 pounds of coke burned on a 3-hour average basis as measured by 40 C.F.R. Part 60 Appendix A Method 5B. COPC will use its best efforts to have the Washington Department of Ecology review the application and timely issue a revised PSD permit.

(d) Prior to the issuance of a final PSD permit amendment which results from the application and any subsequent amended applications submitted pursuant to Paragraph 79(c), COPC will apply to NWCAA for a revision to the Order of Approval to Construct #733a to revise the PM and/or PM-10 emission limitations and the monitoring, operating, and reporting requirements in Conditions D-1(b), D-4, and E-10(f) to be consistent with the final PSD permit amendment obtained by COPC.

80. PM Emission Limits for the LAR Wilmington FCCU. COPC will continue to operate its existing ESP at the LAR Wilmington FCCU. By no later than December 31, 2008, COPC will comply with an emission limit of 0.5 pound PM per 1000 pounds of coke burned on a 3-hour average basis at the LAR Wilmington FCCU.

81.  Continued Shutdown of the Distilling West FCCU and Surrender of the Illinois
State Permits.  The Distilling West FCCU currently is shut down.  This shutdown was not and is
not required by this Consent Decree.  By no later than thirty (30) days after the Date of Lodging
of the Consent Decree, COPC will surrender to the State of Illinois the following permits relating
to the Distilling West FCCU:  75120010 (operating permit for the FCCU); 94040141
(construction permit for FCCU modifications); and 01100084 (construction permit for FCCU
wet gas scrubber).  If at any time prior to the termination of this Decree, COPC seeks to start up
the Distilling West FCCU, COPC will apply for appropriate permits with the State of Illinois as a
new emission source as defined in 35 Ill. Adm.Code 201.102, and will, in such permit
application, agree to install and operate a wet gas scrubber on the Distilling West FCCU
designed to achieve an emission limit of 0.5 pound PM per 1000 pounds of coke burned on a
3-hour average basis.  By no later than one-hundred eighty (180) days after the startup of the
WGS, and at all times thereafter, COPC will demonstrate compliance with a PM emission limit
of 0.5 pound PM per 1000 pounds of coke burned on a 3-hour average basis.  COPC will
demonstrate compliance as set forth in Paragraph 83.

82.  PM emissions during periods of startup, shutdown or Malfunction of the FCCU,
or during periods of Malfunction of a wet gas scrubber or ESP will not be used in determining
compliance with the emission limits of 0.5 pounds of PM per 1000 pounds of coke burned on a
3-hour average basis set forth in Paragraphs 77 - 80, provided that during such periods COPC
implements good air pollution control practices to minimize PM emissions.

83.  Demonstrating Compliance with PM Emission Limits Set Forth in Section V.C
and V.E.  COPC will follow the test methods specified in 40 C.F.R. § 60.106(b)(2) to measure
PM emissions from the FCCUs, except at the Bayway FCCU where COPC will follow

68

NJAC 7:27B-1. COPC will propose and submit the test methods to EPA for approval, with a copy to the Applicable Co-Plaintiff, by no later than three (3) months after the PM limit becomes effective at an FCCU. COPC will conduct the first test no later than six (6) months after the PM limit becomes effective at an FCCU. COPC will conduct annual tests at each FCCU and will submit the results in the first semi-annual report due under Section IX that is at least three (3) months after the test. Except with respect to the Bayway FCCU, upon demonstrating through at least three (3) annual tests that the PM limits are not being exceeded at a particular FCCU, COPC may request EPA approval to conduct tests less frequently than annually at that FCCU.

### D.   CO Emissions Reductions from FCCUs

84.   CO Emissions Limits for the FCCUs. By no later than the following dates for the following FCCUs, COPC will comply with the following CO emission limits:

| FCCU | 500 ppmvd 1-hour average at 0% oxygen | 100 ppmvd 365-day rolling average at 0% oxygen |
|---|---|---|
| Alliance | 9/30/05 | 9/30/05 |
| Bayway | DOL | DOL |
| Borger 29 | DOL | Optional |
| Borger 40 | DOL | Optional |
| Ferndale | DOL | DOL |
| LAR Wilmington | 4/11/05 | Optional |
| Sweeny 3 | 4/11/05 | Optional |
| Sweeny 27 | DOL | Optional |
| Trainer | 12/31/06 | Optional |

69

| Wood River 1 | 4/11/05 | Optional |
| Wood River 2 | 4/11/05 | Optional |

85.     CO emissions during periods of startup, shutdown or Malfunction of the FCCU will not be used in determining compliance with the emission limits of 500 ppmvd CO at 0% $O_2$ on a 1-hour average basis, provided that during such periods COPC implements good air pollution control practices to minimize CO emissions.

86.     Demonstrating Compliance with CO Emission Limits.  Beginning no later than the dates set forth below for each FCCU, COPC will use CO and $O_2$ CEMS to monitor performance of the FCCU:

| FCCU | CEMS |
|------|------|
| Alliance | 9/30/05 |
| Bayway | DOL |
| Borger 29 | 9/30/05 |
| Borger 40 | 9/30/05 |
| Ferndale | DOL |
| LAR Wilmington | 4/11/05 |
| Sweeny 3 | 4/11/05 |
| Sweeny 27 | DOL |
| Trainer | 12/31/06 |
| Wood River 1 | 4/11/05 |
| Wood River 2 | 4/11/05 |

The CEMS will be used to demonstrate compliance with the respective CO emission limits established pursuant to this Section V.D.  COPC will make CEMS data available to EPA and the

Applicable Co-Plaintiff upon demand as soon as practicable. COPC will install, certify, calibrate, maintain, and operate all CEMS required by this Paragraph in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMS (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B. For the Alliance, Borger, Sweeny, and LAR Wilmington FCCUs, unless Appendix F is otherwise required by the NSPS, state law or regulation, or a permit or approval, in lieu of the requirements of 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, COPC must conduct either a Relative Accuracy Audit ("RAA") or a Relative Accuracy Test Audit ("RATA") on each CEMS at least once every three (3) years. COPC must also conduct Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RATA is not performed.

**E.     NSPS Applicability of FCCU Catalyst Regenerators**

87.     The following FCCU catalyst regenerators will be "affected facilities," as that term is used in the Standards of Performance for New Stationary Sources ("NSPS"), 40 C.F.R. Part 60, and will be subject to and comply with the requirements of NSPS Subparts A and J for each of the following pollutants by the following dates:

|  | SO$_2$ | PM | CO |
|---|---|---|---|
| Alliance | 12/31/09 | DOL | 9/30/05 |
| Bayway | DOL | DOL | DOL |
| Borger 29 | 12/31/06 (but see ¶ 88) | 12/31/06 | DOL |
| Borger 40 | 12/31/15 (but see ¶ 88) | 4/11/05 | DOL |
| Ferndale | DOL | DOL | DOL |

| | | | |
|---|---|---|---|
| LAR Wilmington | 6/1/05 | 4/11/05 | 4/11/05 |
| Sweeny 3 | 6/30/06 | 4/11/06 | 4/11/05 |
| Sweeny 27 | 6/30/06 | 4/11/06 | DOL |
| Trainer | 12/31/06 | 12/31/06 | 12/31/06 |
| Wood River 1 | 12/31/08 | DOL | 4/11/05 |
| Wood River 2 | 12/31/12 | DOL | 4/11/05 |

88.   For Borger FCCUs 29 and 40, if COPC makes the notification to EPA under Paragraph 58, the NSPS compliance dates for $SO_2$ will be December 31, 2007, instead of the dates set forth in Paragraph 87.

89.   The deadlines imposed under Sections V.C and V.D will not affect COPC's obligation to comply with the MACT II (40 C.F.R. § 63.640) in a timely manner.

90.   Opacity Monitoring at the FCCUs.  By no later than the following dates, COPC will install and operate a Continuous Opacity Monitoring System ("COMS") to monitor opacity at each of the following FCCUs:

| | |
|---|---|
| Alliance | DOL |
| Bayway | 12/31/05 |
| Borger 29 | DOL |
| Borger 40 | DOL |
| Ferndale | 12/31/06 |
| LAR Wilmington | 4/11/05 |
| Sweeny 3 | DOL |
| Sweeny 27 | DOL |
| Trainer | 12/31/06 |

72

Wood River 1              DOL

Wood River 2              DOL

COPC will install, certify, calibrate, maintain, and operate all COMS required by this Consent Decree in accordance with 40 C.F.R §§ 60.11, 60.13 and Part 60 Appendix A, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B.

91.   As an alternative to the requirement to install a COMS under Paragraph 90, COPC may request from EPA an AMP to demonstrate compliance with the NSPS opacity limits at 40 C.F.R. § 60.105(a)(1) for those FCCUs which have wet gas scrubbers by establishing operating limits as set forth in 40 C.F.R. § 63.1564(a)(2). If approved by EPA, COPC may utilize the AMP in lieu of a COMS.

92.   For FCCU Catalyst Regenerators that become affected facilities under NSPS Subpart J pursuant to Paragraph 87, entry of this Consent Decree and compliance with the relevant monitoring requirements of this Consent Decree for FCCUs will satisfy the notice requirements of 40 C.F.R. § 60.7(a) and the initial performance test requirement of 40 C.F.R. § 60.8(a).

**F.    NO$_x$ Emissions Reductions from Combustion Units**

93.   NO$_x$ Emissions Reductions from Combustion Units:  Overview.  COPC will implement a program to reduce and monitor NO$_x$ emissions from the Combustion Units in Appendix B through the implementation of the provisions of Paragraphs 94 - 104 of this Consent Decree.  At the Distilling West Combustion Units, COPC will undertake the program set forth in Paragraphs 105 - 108, which, for COPC (not Premcor), will supercede and replace the requirements of the decree entered in the case of United States et al. v. Clark Refining and Marketing, Inc., Civ. Act. No. 99-87-GPM (Sept. 26, 2001).

94.　Installation of Qualifying Controls for NOₓ Emissions from Combustion Units.

(a)　For Combustion Units other than internal combustion engines, COPC will select

one or any combination of the following "Qualifying Controls" to satisfy the requirements of

Paragraphs 95, 98, and 99:

（i）　SCR or SNCR;

（ii）　Current Generation or Next Generation Ultra-Low NO$_x$ Burners;

（iii）　Other technologies that COPC demonstrates to EPA's satisfaction will
reduce NO$_x$ emissions to 0.040 lbs per mmBTU or lower; or

（iv）　Permanent shutdown of a Combustion Unit with surrender of its operating
permit; provided however, that to the extent that the emissions reductions
resulting from the permanent shutdown are used to satisfy the
requirements of Paragraphs 95, 98, and 99, those reductions may not be
used as reductions for the construction of new units or the modification of
existing units permitted collectively as a single project with the shutdown,
notwithstanding the provisions of Paragraph 262(d).

(b)　For internal combustion engines ("ICEs"), COPC will select one or any

combination of the following "Qualifying Controls" to satisfy the requirements of Paragraphs 95,

98, and 99:

（i）　Permanent shutdown of the ICE with surrender of the operating permit;
provided however, that to the extent that the emissions reductions resulting
from the permanent shutdown are used to satisfy the requirements of
Paragraphs 95, 98, and 99, those reductions may not be used as reductions
for the construction of new units or the modification of existing units
permitted collectively as a single project with the shutdown,
notwithstanding the provisions of Paragraph 262(d);

（ii）　Installation of combustion controls to automatically adjust fuel/air
mixtures to minimize NO$_x$ emissions combined with either: (a) installation
of exhaust gas catalytic converters on 4-stroke engines; or (b) installation
of Pre-Stratified Charge Systems on 2-stroke engines;

（iii）　Installation of other new technologies that COPC demonstrates to EPA's
satisfaction will reduce NO$_x$ emissions by 80% or greater versus an
uncontrolled ICE.

74

95.    On or before December 31, 2012, COPC will use Qualifying Controls to reduce

$NO_x$ emissions from the Combustion Units listed in Appendix B by at least 4951 tons per year,

so as to satisfy the following inequality:

$$\sum_{i=1}^{n} [ (E_{actual})_i - (E_{allowable})_i ] \geq 4951 \text{ tons of } NO_x \text{ per year}$$

Where:

$(E_{allowable})_i$ = [(The permitted allowable pounds of $NO_x$ per million BTU for
Combustion Unit i, or, the requested portion of the permitted
reduction pursuant to Paragraph 262)/(2000 pounds per ton)] x
[(the lower of permitted or maximum heat input rate capacity in
million BTU per hour for Combustion Unit i) x (the lower of 8760
or permitted hours per year)];

$(E_{Actual})_i$ = The tons of $NO_x$ per year prior actual emissions during the refinery
baseline years (unless prior actual emissions exceed allowable
emissions, then use allowable) as shown in Appendix B for each
Combustion Unit i listed in Appendix B; and

n = The number of Combustion Units with Qualifying Controls from
those listed in Appendix B that are selected by COPC to satisfy the
requirements of the equation set forth in this Paragraph 95 of this
Consent Decree.

96.    Appendix B.  Appendix B to this Decree provides the following information for

the Combustion Units:

(a)    The maximum physical heat input capacity in mmBTU/hr (HHV);

(b)    The allowable heat input capacity in mmBTU/hr (HHV), if different from the
maximum physical heat input capacity;

(c)    The baseline emissions rate for the agreed-upon baseline calendar years in
lb/mmBTU (HHV) and tons per year;

(d)    the type of data used to derive the emissions estimate (*i.e.*, emission factor, stack
test, or CEMS data); and

75

(e)     the utilization rate in annual average mmBTU/hr (HHV) for the agreed upon
baseline calendar years.

97.     $NO_x$ Control Plan.  COPC will submit a detailed $NO_x$ control plan ("$NO_x$ Control

Plan") to EPA for review and comment by no later than June 30, 2005, with annual updates

(covering the prior calendar year) on June 30 of each year thereafter until termination of the

Consent Decree.  Copies of the $NO_x$ Control Plans will be submitted to the Applicable

Co-Plaintiff.  The $NO_x$ Control Plan and its updates will describe the achieved and anticipated

progress of the $NO_x$ emissions reductions program for the Combustion Units and will contain the

following information for each Combustion Unit that COPC plans to use to satisfy the

requirements of Paragraphs 95, 98, or 99:

(a)     All of the information in Appendix B;

(b)     Identification of the type of Qualifying Controls installed or planned with date
installed or planned (including identification of the Combustion Units to be
permanently shut down);

(c)     To the extent limits exist or are planned, the allowable $NO_x$ emission rates (in
lbs/mmBTU (HHV), with averaging period) and allowable heat input rate (in
mmBTU/hr (HHV)) obtained or planned with dates obtained or planned;

(d)     The results of emissions tests and annual average CEMS or PEMs data (in ppmvd
at 3% $O_2$, lbs/mmBTU) conducted pursuant to Paragraph 100 and tons per year;
and

(e)     The amount in tons per year applied or to be applied toward satisfying
Paragraph 95.

Appendix B and the Control Plan and updates required by this Paragraph will be for

informational purposes only and may contain estimates.  They will not be used to develop permit

requirements or other operating restrictions.  COPC may change any projections, plans, or

information that is included in the Control Plan or updates.  Nothing in this Paragraph will affect

any requirements for the development or submission of a $NO_x$ control plan pursuant to otherwise

applicable state or local law (e.g., Bay Area Air Quality Management District Regulation 9, Rule 10).

98.    By December 31, 2008, COPC will install sufficient Qualifying Controls and have applied for emission limits from the appropriate permitting authority sufficient to achieve two-thirds of the $NO_x$ emission reductions required by Paragraph 95. By no later than March 31, 2009, COPC will provide EPA and the Applicable Co-Plaintiff with a report showing how it satisfied the requirements of this Paragraph.

99.    By no later than December 31, 2012, Combustion Units with Qualifying Controls will represent at least 30% of the total maximum heat input capacity or, if less, the allowable heat input capacity, as shown in Appendix B, of all of the Combustion Units located at a particular Covered Refinery. This 30% requirement will apply to the Combustion Units at the Wood River Refinery exclusive of the Distilling West Combustion Units. Any Qualifying Controls can be used to satisfy this requirement, regardless of when the Qualifying Controls were installed.

100.    Beginning no later than one-hundred eighty (180) days after installing Qualifying Controls on and commencing operation of a Combustion Unit that will be used to satisfy the requirements of Paragraph 95, COPC will monitor the Combustion Units as follows:

(a)    For Combustion Units with a maximum physical capacity greater than 150 mmBTU/hr (HHV), install or continue to operate a $NO_x$ CEMS;

(b)    For Combustion Units with a maximum physical capacity greater than 100 mmBTU/hr (HHV) but less than or equal to 150 mmBTU/hr (HHV), install or continue to operate a $NO_x$ CEMS, or monitor $NO_x$ emissions with a PEMS developed and operated pursuant to the requirements of Appendix E of this Consent Decree.

(c)    For Combustion Units with a maximum physical capacity of less than or equal to 100 mmBTU/hr (HHV), conduct an initial performance test and any periodic tests that may be required by EPA or by the applicable State or local permitting

77

authority under other applicable regulatory authority. The results of the initial performance testing will be reported to EPA and the Applicable Co-Plaintiff.

COPC will use Method 7E or an EPA-approved alternative test method to conduct initial performance testing for $NO_x$ emissions required by subparagraph 100(c). Monitoring with a PEMS required by this Paragraph will be conducted in accordance with the requirements of Appendix E. Units with Qualifying Controls installed before the Date of Entry that are subject to this Paragraph will comply with this Paragraph by no later than June 30, 2006.

101.    COPC will certify, calibrate, maintain, and operate the $NO_x$ CEMS required by Paragraph 100 in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMS (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B.

102.    The requirements of this Section V.F. do not exempt COPC from complying with any and all federal, state, regional, and local requirements that may require technology, equipment, monitoring, or other upgrades based on actions or activities occurring after the Date of Lodging of this Consent Decree, or based upon new or modified regulatory, statutory, or permit requirements.

103.    COPC will retain all records required to support its reporting requirements under this Section V.F. until termination of the Consent Decree. COPC will submit such records to EPA and the Applicable Co-Plaintiff upon request.

104.    If COPC transfers ownership of any refinery before achieving all of the $NO_x$ reductions required by Paragraph 95, COPC will notify EPA and the Applicable Co-Plaintiff of that transfer and will submit an allocation to EPA and the Applicable Co-Plaintiff for that

refinery's share of $NO_x$ reduction requirements of Paragraph 95 that will apply individually to the transferred refinery after such transfer. If COPC chooses, such allocation may be zero.

105.   $NO_x$ Emissions Reductions from the Distilling West Combustion Units: Overview. COPC will undertake a program to install a combination of Current Generation Ultra Low-$NO_x$ Burners, Next Generation Ultra Low-$NO_x$ Burners and, where applicable, Low-$NO_x$ Burners on the Distilling West Combustion Units at a cost of One Million Five-Hundred Thousand Dollars ($1.5 million) (including engineering and installation costs); provided however, that the cost of the equipment alone will be not less than Nine-Hundred, Twenty Thousand Dollars ($920,000). This program will be completed by no later than December 31, 2009.

106.   $NO_x$ Control Plan for the Distilling West Combustion Units. By no later than ninety (90) days after the Date of Lodging of this Consent Decree, COPC will submit to EPA and IEPA for their review and comment, an initial plan for $NO_x$ emission reductions from the Distilling West Combustion Units ("$NO_x$ Control Plan for the Distilling West Combustion Units"). For each Distilling West Combustion Unit, the Plan will include:

(a)   The maximum physical heat input capacity in mmBTU/hr (HHV);

(b)   The allowable heat input capacity in mmBTU/hr (HHV), if different from the maximum physical heat input capacity;

(c)   if the Combustion Unit has been restarted by the time of the submission of the initial $NO_x$ Control Plan for the Distilling West Combustion Units, the actual $NO_x$ emission rate and the type of data used to derive the emission estimate (*i.e.*, emission factor, stack test, or CEMS data);

(d)   if the Combustion Unit has not been restarted by the time of the submission of the initial $NO_x$ Control Plan for the Distilling West Combustion Units, a projection of the date, if any, that COPC plans to restart the unit, as well as an identification of COPC's intent with respect to the type of data that COPC will use to measure the $NO_x$ emission rate upon the restart;

(e)     an identification of all Distilling West Combustion Units at which COPC intends
to install Low-NO$_x$ Burners, Current Generation Ultra Low-NOx Burners and/or
Next Generation Ultra Low-NOx Burners, the expected manufacturer and type of
burners, the expected emission rate from the burners, and the projected date of
installation; and

(f)     an identification of all Distilling West Combustion Units at which COPC has
determined that the installation of Low-NO$_x$ Burners, Current Generation Ultra
Low-NOx Burners and/or Next Generation Ultra Low-NOx Burners is technically
or commercially impracticable, and an explanation of the rationale behind this
determination.

107.   Updates to the NO$_x$ Control Plan for the Distilling West Combustion Units. As

part of the NO$_x$ Control Plan and updates that COPC must submit pursuant to Paragraph 97

(including the first plan due on June 30, 2005), COPC will submit to EPA and IEPA for their

review and comment, updates to the NO$_x$ Control Plan for the Distilling West Combustion Units

until such time as COPC has expended the One Million Five-Hundred Thousand Dollars ($1.5

million) (including engineering and installation costs) and Nine-Hundred, Twenty Thousand

Dollars ($920,000) in equipment alone that COPC is required to spend.  The updates will include

the information set forth in Paragraph 106 and will identify the amount of funds expended to

date, including a breakdown among engineering, installation, and equipment costs.

108.   NO$_x$ Emissions Limits at the Distilling West Combustion Units.  By no later than

one-hundred eighty (180) days after the installation of any Low-NO$_x$ Burner, Current Generation

Ultra Low-NOx Burner, or Next Generation Ultra Low-NOx Burner installed on the Distilling

West Combustion Units pursuant to Paragraph 105, COPC will monitor the unit in accordance

with the requirements of Paragraph 100.  By no later than two-hundred forty (240) days after

installation, COPC will propose to EPA and IEPA hourly and annual NO$_x$ emission limits for the

affected Distilling West Combustion Unit based on CEMS data, stack test results, and/or any

additional source specific emission data.  COPC will comply with the emission limits

immediately upon submission of the proposal unless and until EPA, after consultation with IEPA, sets a different emission limit. EPA, after consultation with IEPA, will approve the emission limits proposed by COPC or will propose alternative emission limits based on source specific emission data. COPC will immediately (or within thirty (30) days if EPA's limit is more stringent than the limit proposed by COPC) operate the affected Distilling West Combustion Unit so as to comply with the EPA-established emission limits. COPC will comply with the permitting requirements of Section V.P to ensure that the emissions limits for the Distilling West Combustion Units established pursuant to this Paragraph are enforceable by the United States and the State of Illinois.

109. <u>Installation of SCR on the Bayway Crude Pipestill Heater</u>. COPC will install and operate an SCR system on the Bayway Crude Pipestill Heater by no later than December 31, 2010. COPC will design the SCR system to achieve at least a 90% control efficiency for $NO_x$ emissions from the Bayway Crude Pipestill Heater. The 90% control efficiency will apply to the equipment comprising the Bayway Crude Pipestill Heater at the time of the design of the SCR System and to the concentration and amount of $NO_x$ emissions released to the atmosphere at the time of that design. Beginning no later than one-hundred eighty (180) days after installing the SCR System, COPC will monitor emissions from the Bayway Crude Pipestill Heater by means of a $NO_x$ CEMS. COPC will certify, calibrate, maintain, and operate the $NO_x$ CEMS in accordance with the requirements of Paragraph 101. COPC will demonstrate compliance with state permit limits for the Bayway Crude Pipestill Heater at the time and in the manner established by the NJDEP. $NO_x$ emissions reductions from the Bayway Crude Pipestill Heater of 500 tons per year may not be used in satisfying the requirements of Paragraphs 95, 98, and 99. For purposes of this unit only, $NO_x$ emissions reductions from the Bayway Crude Pipestill Heater greater than 500

81

tons per year from the 2002/2003 average $NO_x$ baseline emissions of 903 tons are not included in

the general prohibition against the use of Consent Decree emission reductions in Paragraph 261

to the extent these emissions reductions are not used in satisfying the requirements of

Paragraphs 95 and 98.

### G.   SO₂ Emissions Reductions from and NSPS Applicability to Heaters and Boilers

110.   NSPS Applicability of Heaters and Boilers at the Borger, Ferndale, Rodeo and

Santa Maria Refineries and at Distilling West.  By no later than the Date of Lodging, all heaters

and boilers at the Borger, Ferndale, Rodeo, and Santa Maria Refineries and at Distilling West

will be affected facilities, as that term is used in the NSPS, 40 C.F.R. Part 60, and will be subject

to and comply with the requirements of NSPS Subparts A and J for fuel gas combustion devices.

111.   NSPS Applicability of Heaters and Boilers at the Alliance Refinery.  By no later

than the Date of Lodging for all heaters and boilers at the Alliance Refinery except for heater

191-H-1, and by no later than December 31, 2006, for heater 191-H-1, the heaters and boilers at

the Alliance Refinery will be affected facilities, as that term is used in the NSPS, 40 C.F.R. Part

60, and will be subject to and comply with the requirements of NSPS Subparts A and J for fuel

gas combustion devices.

112.   NSPS Applicability of Heaters and Boilers at the LAR Carson and Wilmington

Plants.  By no later than the Date of Lodging, all heaters and boilers at the LAR Carson and

Wilmington Plants will comply with the emissions limits at 40 C.F.R. § 60.104(a)(1).  By no

later than March 31, 2005, COPC will submit one or more proposed AMP(s) to EPA for

approval.  All heaters and boilers at the LAR Carson and Wilmington Plants will be affected

facilities, as that term is used in the NSPS, 40 C.F.R. Part 60, and will be subject to and comply

with the requirements of NSPS Subparts A and J for fuel gas combustion devices upon EPA's approval of the AMP.

113. NSPS Applicability of Heaters and Boilers at the Sweeny, Trainer, and Wood River (except for Distilling West) Refineries. By no later than June 30, 2005, COPC will submit a compliance plan for all heaters and boilers at the Sweeny, Trainer, and Wood River (except Distilling West) Refineries to EPA for approval, with a copy to the Applicable Co-Plaintiff, that identifies the activities and schedule necessary to ensure compliance with the requirements of 40 C.F.R. Part 60, Subparts A and J as soon as practicable. By no later than June 30, 2008, (and sooner if practicable), all heaters and boilers at the Sweeny, Trainer, and Wood River (except Distilling West) Refineries will be affected facilities, as that term is used in the NSPS, 40 C.F.R. Part 60, and will be subject to and comply with the requirements of NSPS Subparts A and J for fuel gas combustion devices.

114. NSPS Applicability of Heaters and Boilers at the Bayway Refinery.

(a) By no later than the Date of Lodging, all heaters and boilers at the Bayway Refinery, except for those listed in Subparagraph 114(b), will be affected facilities, as that term is used in the NSPS, 40 C.F.R. Part 60, and will be subject to and comply with the requirements of NSPS Subparts A and J for fuel gas combustion devices.

(b) Upgrade of the Refinery Fuel Gas System at the Bayway Refinery. By no later than December 31, 2010, COPC will complete an upgrade of the refinery fuel gas system at the Bayway Refinery to ensure that the fuel gas contains less than 0.1 grains of $H_2S$ per dry standard cubic foot of fuel gas. By no later than June 30, 2011, the following heaters and boilers at the Bayway Refinery will be affected facilities, as that term is used in the NSPS, 40 C.F.R. Part 60,

83

and will be subject to and comply with the requirements of NSPS Subparts A and J for fuel gas

combustion devices:

        F-701 (Pipestill Atmospheric Tower)

        F-702 (Pipestill Outboard Flash Tower)

        F-751 (Pipestill Vacuum Tower)

        F-101 (DSU1 gas oil heater)

        F-401 (DSU2 reactor heater)

        F-251 (FCCU feed preheater)

        F-101 (Powerformer hydrofiner)

        F-102 (Powerformer reheater)

        F-103 (Powerformer reheater)

        F-104 (Powerformer reheater)

        F-105 (Powerformer reheater)

        F-106 (Powerformer Regen gas heater)

        F-107 (Powerformer dryer heater)

        F-108 (Powerformer Reboiler heater)

115.    For heaters and boilers that become affected facilities under NSPS Subpart J

pursuant to this Section V.G, entry of this Consent Decree and compliance with the relevant

monitoring requirements of this Consent Decree will satisfy the notice requirements of 40 C.F.R.

§ 60.7(a) and the initial performance test requirement of 40 C.F.R. § 60.8(a).

116.    To the extent that COPC seeks to use an alternative monitoring method at a

particular fuel gas combustion device to demonstrate compliance with the limits at 40 C.F.R.

§ 60.104(a)(1), COPC may begin to use the method immediately upon submitting the application

for approval to use the method, provided that the alternative method for which approval is being sought is the same as or is substantially similar to the method identified as the "Alternative Monitoring Plan for NSPS Subpart J Refinery Fuel Gas" attached to EPA's December 2, 1999, letter to Koch Refining Company LP.

117.   <u>Elimination/Reduction of Fuel Oil Burning</u>.

(a)   <u>Existing Combustion Devices</u>.  From the Date of Lodging of this Consent Decree, COPC will not burn Fuel Oil in any existing combustion device at the Covered Refineries except: (i) during periods of Natural Gas Curtailment, Test Runs, or operator training; or (ii) for the Trainer Refinery, as set forth in Paragraph 118.  These exemptions are not available for any combustion devices at Distilling West.  Nothing in this prohibition limits COPC's ability to burn Torch Oil in an FCCU regenerator to assist in starting, restarting, maintaining hot standby, or maintaining regenerator heat balance.

(b)   <u>Combustion Devices Constructed After Lodging</u>.  After the Date of Lodging, COPC will not construct any new combustion device at the Covered Refineries that burns fuel oil unless the air pollution control equipment controlling the combustion device either (i) has an $SO_2$ control efficiency of 90% or greater; or (ii) achieves an $SO_2$ concentration of 20 ppm at 0% $O_2$ or less on a three-hour rolling average basis.  Nothing in this Paragraph will exempt COPC from securing all necessary permits before constructing a new combustion device.

118.   Commencing on the Date of Lodging, COPC will limit Fuel Oil burning at the Trainer Refinery to no greater than 900 barrels per day on a 365-day rolling average basis and will limit this Fuel Oil burning to Boilers B-6, B-7, and B-8.  Fuel Oil combusted during periods of Natural Gas Curtailment will not be counted in the 365-day rolling average.  By no later than